## John A. C. Gray and Others v. Norman J. Emmons and Others.

It is the policy of the law to scrutinize gifts, conveyances and securities, by a client to his attorney pending the relation, especially when connected with the subject matter of litigation; and it will not permit the relation and the confidence it implies, to be turned to the profit of the attorney at the expense of the client.

Where the attorneys of complainants who were assignees of a portion of a chattel mortgage on a stock of goods, with priority of payment, took possession of the mortgaged property, and, without authority from complainants, sold more than was sufficient to satisfy their portion of the mortgage, and were sued by the owner of the balance, and recovery had against them;— *Held*, that the attorneys had no equity against complainants to require to be indemnified for their act in selling the excess.

Nor does it make any difference in this respect, that the attorneys appear to have acted, in making such sales, on a supposed authority from the owner of the balance of the mortgage; as the law in such case, complainants not being in fault, will leave the misfortune to rest where it has fallen.

Accordingly where, in such case, after suit brought against the attorneys for the value of the goods sold beyond what was sufficient to pay complainants' debt, they obtained from their clients a bond of indemnity against the suit—the clients supposing the suit to be brought for the whole value of the goods sold under the mortgage—*Held*, that the bond was wrongfully obtained, and should be given up to be cancelled.

Nor is the right of complainants to this relief affected by their employing counsel to defend the suit against the attorneys—they having already given the bond, and there being no evidence they knew at the time what their rights were.

Such bond of indemnity, where the only liability of the attorneys was for making sale of the excess after satisfying the claim of their clients, is without consideration.

*Heard October 11th, 12th and 13th. Decided December 9th.*

Appeal from the Wayne Circuit in Chancery.

The bill was filed by complainants, who composed the firm of John A. C. Gray & Co., against Norman J. Emmons, John H. Van Dyke, and James V. Campbell, to have given up and cancelled an indemnity bond given by complainants to Emmons & Van Dyke, and which the latter, through Campbell as their attorney, were seeking to enforce, by suit at law in the Wayne Circuit Court.

The bill states that in 1851, Crampton & Osborn, of Milwaukee, were indebted to complainants, who employed

the defendants, Emmons & Van Dyke, attorneys, doing business at Milwaukee, to collect this claim; that Emmons & Van Dyke received upon it, from one Joseph C. Dowe, a draft, purporting to have been drawn by Garrison & Fritz, accepted by Martin, Oliver & Co., payable to James M. Ray, for $3,900, and Dowe also assigned to complainants, with the right of priority, a chattel mortgage on a stock of goods, executed by Ray to Dowe to secure, amongst other claims amounting to over $8,900, the draft for $3,900. This draft being unpaid and a forgery, Emmons & Van Dyke demanded the goods of Dowe, who had them in possession, and he refused to deliver them; thereupon Emmons & Van Dyke replevied the goods in the name of complainants, from Dowe, and upon getting possession, deposited the whole stock with one Caleb Wall, an auctioneer, who, at the request of Emmons & Van Dyke, caused them to be advertised for the purpose of selling sufficient thereof to pay the $3,900 and costs; and Wall proceeded to sell the goods at auction, and sold enough to make the $3,900 and expenses; that Emmons & Van Dyke then, without right, authority, or direction of complainants, and in direct violation of the rights of others, caused the remainder of the goods also to be sold; whereas they should have returned the balance unsold to Dowe: That soon after Emmons & Van Dyke obtained the possession of said goods, they advised complainants that they would proceed and sell sufficient to make the $3,900, and the latter were not advised of the sale of the balance for months after they had all been sold, nor did they expect Emmons & Van Dyke would sell more than sufficient to pay the $3,900:

That the action of replevin to recover the goods of Dowe was tried, and judgment rendered in favor of complainants on the 27th of January, 1852, after all the goods had been sold by Wall; that Dowe then brought an action of trover against Emmons for the conversion of the

goods, which action was defended by Emmons; that prior
to the commencement of this suit, Emmons & Van Dyke
had remitted to complainants $2,300 of the proceeds of
the goods, but retained the balance to indemnify them-
selves against their liability on account of the trover suit
of Dowe, for a long time, and until September, 1852,
when the defendant Van Dyke, being in New York, it
was suggested to him by Mr. Gray that, to obtain the
balance of the money, complainants would indemnify Em-
mons & Van Dyke against damages, by reason of the
taking of the goods; that the complainants were willing
to indemnify and save Emmons & Van Dyke harmless
from all liability they had incurred by reason. of the direc-
tions and authority received from complainants, and for all
necessary liabilities they had incurred in collecting said
debt; not believing, nor were they informed of, their lia-
bility in any way arising therefrom, unless for the mere
taking of said goods on said writ of replevin; that while
Van Dyke was there in New York, it was arranged that
complainants should give a bond, conditioned to indemnify
and save Emmons & Van Dyke harmless for collecting
said $3,900, and their necessary acts only for that pur-
pose, and so far as was necessary in the performance of
their duties as the attorneys of complainants : That Em-
mons & Van Dyke sent a form of bond from Milwaukee
to complainants, and also a remittance of $1,100, the bal-
ance of the $3,900 less costs and charges; that complainants
dated and signed the bond, and returned it to Emmons &
Van Dyke; that they executed the bond, fully relying upon,
and reposing confidence in, Emmons & Van Dyke, that the
bond was to indemnify them only against such acts and
proceedings as they were lawfully authorized to take and
institute for the collection of the $3,900, and no other;
that they are advised Emmons & Van Dyke insist that the
bond is conditioned to indemnify them from all and every
act, and proceeding, in any way relating to the business, as

well lawful as unlawful acts, and particularly for the wrong-ful sale of the surplus of the goods; that complainants had no knowledge at the time they executed the bond, that Van Dyke & Emmons had so sold the goods, nor that the suit of Dowe was for taking and selling any goods except to satisfy the $3,900 collected by Emmons & Van Dyke; that in November, 1852, a judgment for $5,000 and costs was recovered by Dowe against Emmons, and was affirmed by the Supreme Court of the state of Wisconsin.

The complainants allege that the suit was not properly defended; that Emmons did not show what disposition was made of the surplus money arising from the sale; that it was decided in the case that it was lawful for Emmons & Van Dyke to have sold sufficient to make the $3,900 and expenses; that it was unlawful for them to sell any more goods, after sufficient had been sold to make the $3,900 and costs, and that, therefore, the entire liability of appel-lants on the bond arose, and wholly occurred, by reason of the mistakes, errors and mismanagement of Emmons & Van Dyke, after they performed their duties to appellants, as their attorneys, by exceeding their lawful power and au-thority as such attorneys. And the bill prays that the suit on said bond may be enjoined, and the bond itself cancelled.

The answer of Emmons & Van Dyke denies that they sold, or caused to be sold, any of said goods, after sufficient thereof had been sold to realize $3,900 and expenses of sale. They insist that they had a lawful right to sell, or cause to be sold, all the goods mentioned in the mortagage, returning to Dowe the surplus money after paying complain-ants, but that they did not exercise that right; that Dowe, by his authorized agent, assented to the sale of the whole of the said goods, and joined in the directions to Wall for the sale, and recognized the right of complainants to recover the $3,900:

That they have no recollection of advising complainants that they would proceed and sell sufficient to make the $3,900,

and upon their belief deny they gave such information; that they received instructions from complainants to sell the goods; that they can not state when all the goods were sold, but immediately afterwards informed complainants that they had been sold, and before the trial of the replevin suit; that complainants were explicitly informed of the fact that the whole of the goods had been sold, and of the amount produced, several months before the bond was given:

That before Dowe commenced the suit in trover against Emmons, they had remitted $2,300 to complainants, and that the balance was retained for a considerable period of time; but they deny that it was retained as an indemnity against their liability on account of said suit; that after Dowe commenced the action of trover they did decline to remit to the complainants the balance they had accidentally retained, until a favorable issue of that suit; and they would have also retained the $2,300 if the suit had been commenced before they remitted the money:

That Mr. Van Dyke was in New York, and complainants proposed to execute a bond of indemnity, and that defendants should then remit the money; but they deny that such proposition was simply to indemnify the defendants against liability on account of taking of the goods, but on the contrary allege, that complainants were then fully and truly informed of all the facts and circumstances connected with the sale of the goods, and of all that defendants knew or had learned concerning the alleged wrong complained of by Dowe in said trover suit; that with this information the complainants proposed to give the bond to indemnify defendants against their indemnity to Wall, all or any liability incurred by reason of the agency of defendants in the premises, or against the suit of Dowe in all its consequences; that they, Emmons & Van Dyke, prepared the bond, and sent it to complainants, by whom it was executed: They deny that complainants executed the bond in the belief that they were merely indemnifying Emmons & Van Dyke against

such acts as might be adjudged lawful; that it was the intent of both parties that defendants should be indemnified fully and completely, against the consequences of all and every their acts and doings without fraud in the premises:

That the complainants knew when they signed the bond that the trover suit by Dowe was instituted for all the goods in said mortgage mentioned, and the pretence of complainants that, when they signed the bond, they believed the Dowe suit was merely for taking and selling sufficient goods to pay $3,900 is false. They admit the recovery of the judgment for $5,000, and affirmation thereof, but deny it was recovered by reason of any negligence in defending the suit, and deny the suit was improperly defended, and deny that it was not shown what disposition was made of the surplus; they aver that Mr. Arnold was retained by complainants to defend the suit; admit the court decided as alleged in the bill, but aver that Emmons was unable to procure from the circuit judge a fair bill of exceptions.

A replication being filed in the case, testimony was taken as follows:

*H. Zabriske*, a witness for complainants, testified to hearing a conversation between Van Dyke and Gray, at Gray's office in New York, about September 1st, 1852. Van Dyke explained to Gray why the balance of about $1,100, due on their collection from Crompton & Osborn, had not been remitted, and said that Dowe had recently commenced a suit against Emmons to recover the amount they had collected for complainants, on the sale of the goods, and in consequence of this suit the balance in their hands had been retained to abide the result of that suit. Gray at once proposed to Van Dyke, that complainants would give a bond of idemnity to cover the whole amount of the $3,900 collected. Van Dyke assented to this, and said he would send the money, with the bond to be executed, as soon as he reached home. A letter was soon after received from

Emmons & Van Dyke, enclosing the balance and the bond, and complainants executed the bond, and returned it by mail. Nothing was said in the conversation testified to by witness about any liability in the Dowe suit beyond the $3,900, nor about Emmons & Van Dyke being indemnified against a bond given by them to Wall, the auctioneer.

*S. E. Darling*, a witness for complainants, testified to being present and hearing the same conversation.

*Wall*, the auctioneer, called for defendants, testified to selling the goods, and paying over the proceeds, a part to Emmons & Van Dyke, and a part to other persons by whom he was garnisheed. Emmons & Van Dyke, or one of them, gave witness instructions in regard to selling the goods. Waldo and Emmons were once in the store, and came to some understanding while there, and Emmons told witness to sell the goods. Witness got all his instructions about selling the goods from Emmons & Van Dyke, in connection with Waldo. Waldo tried to evade everything that looked like being an agent for Dowe, but witness was satisfied he was his agent. He negociated with witness, and with others, for the sale of the goods.

*J. E. Arnold*, a witness for defendants, tried the suit of *Dowe v. Emmons* for defendant. After judgment against defendant, witness took it to the Supreme Court by writ of error. There was a good deal of trouble in getting a bill of exceptions settled. The case was diligently and faithfully attended to in both the Circuit and Supreme Courts, on behalf of Emmons. Witness was present at Milwaukee at an interview between Emmons and Gray, while the suit was pending in the Supreme Court. The interview was at considerable length, and related to the condition of the case, the points which arose on the trial, the points on which it went to the Supreme Court, and the chances of success. This was in May, 1853. Witness told Gray he could not be certain of any suit, but thought that a safe one. Emmons suggested that perhaps the suit

might be compromised, and witness said he was always in favor of settling suits, and would recommend that that should be, if it could be done for a reasonable sum. Gray stated a sum he had proposed, and that he was to meet Mr. Crampton about it, to receive his answer to the proposition. Gray said, if the suit was not settled, he wished witness to go on in conjunction with Mr. Emmons, and he, Gray, would foot the bill. Gray was fully informed of what the case was, and how it stood, in all its particulars. Witness explained to him that the judgment was for the excess of the sale over complainant's debt. He understood that the judge held the sale valid as far as their claim was concerned, and that the illegality of the matter, and the ground of recovery, was the selling the excess of the goods after the claim was satisfied. Witness don't remember that anything was said about a bond of indemnity to Emmons & VanDyke. Gray made it his case, and said go on with it, and he would make it all right. He said if the offer of compromise he had made to Crampton was rejected, we should listen to no other offers of compromise, but go on with the suit. Gray afterwards paid the charges of witness in the case.

*J. H. Crampton*, a witness on behalf of defendants, had a conversation with Gray about the suit of *Dowe v. Emmons*, at Milwaukee, in the spring of 1853. Witness made some censures on the course pursued by Emmons & Van Dyke, and Gray checked him. Gray alluded to Dowe's judgment, and wanted witness to intercede, conveying the idea pretty strongly that witness controlled, and could discharge it. Gray said it was not Emmons & Van Dyke witness was persecuting by following the suit up, and prompting Dowe, but John A. C. Gray & Co.; that the responsibility rested on them, and that Emmons & Van Dyke were protected from all loss they might sustain in consequence of it. He said he was about to go to Europe, and if the matter was not arranged before he left, it could

not be, as he had full control of it, and nobody else was, or would be, authorized to compromise it.    Witness was one of the firm of Crampton & Osborne.

Several letters from Emmons & Van Dyke to complainants were put in evidence, of which the following are the material portions:

*Sept. 25th,* 1851.   "We were compelled to institute replevin against Dowe to get possession under our mortgage. * * To-morrow we shall have had delivery from the marshall, and then we shall immediately advertise and sell sufficient of the stock to pay the amount secured by the mortgage—thirty-nine hundred dollars."

*Dec. 27th,* 1851.   "In your last you say we do not mention why the account of sales of the mortgaged goods was not closed, and remittance made.   We can not do so until the garnishees served on us are disposed of, which will be next month.   There is some $1,800 left after paying your $3,900.   This sum—$1,800—will not pay the garnishees into about $600.   If they should by possibility recover of you this $600, we mean to make Dowe pay it, for, mind you, he undertook to pay $3,900 of Crampton & Osborne's debt to you, and if his title to the property by which he paid fails, he must make it good."

*Feb. 4th,* 1852.   "We wrote a few days since announcing the result of the replevin suit against Dowe, intending to explain more fully the peculiar character of the trial and the defence.   The day after we wrote you we were served with process at the suit of Dowe, who claims to recover from us the value of the whole stock.   Upon what precise grounds they hope to succeed, we are as yet at a loss to conjecture.   * *   You already know that, while the goods were in progress of sale by Mr. Wall, the auctioneer, that garnishee process was served by other creditors.   So far as we were concerned, we were discharged at the present term from all but one—that is in the state court, and still depending.   They claim about $600, and do,

we are now informed, seek, if there should not be enough otherwise, to make Wall refund enough out of what he. paid us for you; and this we shall beat them on—that is, the law is plain that you, being a *bona fide* creditor of Crampton & Osborne, will not be affected, notwithstanding they make out the sale to Dowe fraudulent. We stand personally bound to Wall to protect him against that pro- ceeding. He has the balance in his hands above $3,900. Dowe called on us, and demanded this balance. We of course. could not comply, telling him the reason why we could not. He immediately commences suit against us in trover, for a wrongful conversion of the goods, and, as we. stated, goes for the whole. In this suit against ourselves, instituted in the state court, we have thought it policy to. retain Mr. Arnold, one of our most experienced and ablest lawyers. We deem the case a plain one, but yet very im-. portant, and demanded that we should retain some one else to manage the defence, all things considered, and especially our predicament as parties. Dowe would have. sued you, but that you were non-residents."

*May* 18*th*, 1852. "We, as you are aware, replevied goods of Crampton & Osborne, in virtue of the chattel mortgage assigned to you to secure the $3,900—portion, of your claim then due. The mortgage was assigned by Dowe to us—or rather to you. On this sale, the goods. produced some $6,000. Your claim and expenses amount. to some $4,400, leaving about enough to pay the Loder claim. They—the Loders—garnisheed the auctioneer after the goods went into his hands to be sold, and thus avoided the difficulties under the attachment proceedings, in a meas-. ure. The auctioneer answered, under the garnishee, that there was an excess in his hands after paying the amount: of your claim. Dowe, under the advice of his counsel, did not claim this excess in the hands of the auctioneer,, but commenced suit against us (because he could not serve. it on you), claiming the value of goods—not their product,

on sale — and hence, under the circumstances, there was no one to dispute Mr. Loder's claim to this excess. Crampton & Osborne did not claim it, because they had before claimed to have sold to Dowe; and Dowe did not claim it, because his counsel advised him he had a chance of recovering more in the present suit. Subsequent to the time the Loders put their claim on the funds in the hands of the auctioneer, there was another garnishee put on the same funds. In getting the balance of the funds from the auctioneer, we had to give him a bond of indemnity. We did this for several reasons. *First*, because we preferred not leaving the money in Wall's hands; and, *Second*, because we feared other and further garnishees, which raise the question of Dowe's right to assign this mortgage. We regard the determination of the suit of the Loders in their favor as settling the question between Dowe and us, and we think is a bar to his action. The suit will be tried, we think, in the course of ten days, and, we think, will result favorably. We apprehend no difficulties from other garnishees, so that if this suit results as we anticipate, your balance of the $3,900 will be remitted without delay."

*Nov.* 16th, 1852. "Dowe's trover suit has just ended, and with the astonishing result of a verdict for plaintiff of $5,000! the value of the stock after deducting the $3,900."

Dec. 7th, 1852. "In Dowe's suit he sought to recover the whole value of the goods irrespective of the mortgage, but, in all events, the surplus value over the $3,900. The facts were that the balance had been attached — first, by Loder & Co., and other creditors, before any of the goods were sold, and after the first directions were given for sale, and in which Mr. Waldo, the agent of Dowe, participated, we never interfered in the least save to receive the $3,900, and notwithstanding the fact of these attachments and recoveries, Judge Hubbell held that Gray &

Co., and consequently we, as his agents, who had transacted the business, were liable, and held to see that the surplus came back to Dowe. The fact that Dowe, by his agent, had acquiesced in the sale, he disposed of by saying it was necessary Dowe should have expressly authorized Waldo so to treat. No matter that we had never had a personal interview with Dowe; that Waldo had managed all, and been held out as the agent with plenary powers, yet that such general authorization was not enough to warrant a consent to sell goods at auction. Mr. Wall, the auctioneer, swore positively that the first instructions from Mr. E. was to sell only to the extent of $3,900, and afterwards he came with Mr. Waldo, who agreed to a sale of the whole. Then followed immediately the attachments. We took our $3,900, and the creditors the balance. The judgment is utterly irreconcilable with law or honesty, and must be reversed."

The bond in controversy was dated Sept. 24th, 1852, and was conditioned as follows:

"Whereas, the said obligors brought a certain suit in replevin in the District Court of the United States for the district of Wisconsin, against Joseph C. Dowe, in which said suit said Emmons & Van Dyke were employed as the attorneys and agents of said obligors, which said action was brought to recover the possession of certain goods withheld by the said Dowe; and whereas the said Emmons & Van Dyke on sale of the said goods have remitted to us, the said obligors, the amount of our claim on account of which said suit was instituted, less a certain sum retained by them on account of their charges, as per their statement rendered us: And whereas the said Emmons & Van Dyke were compelled to indemnify the auctioneer on his paying the proceeds of said goods over to them for us: And whereas also the said Dowe has brought suit in the Circuit Court for the county of Milwaukee against Norman J. Emmons, one of said firm, to recover damages on account of the

taking and selling said goods. Now, therefore, if the above bounden obligors shall pay all damages and costs that may be recovered by the said Dowe in said suit, on the final determination thereof, and shall forever indemnify and save harmless the said Emmons & Van Dyke, and either of them, from all suits, costs, and liabilities on account of said replevin suit, and their agency in or growing out of the matter aforesaid, as well as on account of their liabilities in the said bond to Caleb Wall, the auctioneer, on his paying over the money aforesaid, then this obligation to be void and of none effect, otherwise to be and remain in full force and effect."

On the hearing in the Wayne Circuit in Chancery, the bill of complaint was dismissed with costs, and complainants appealed.

*G. V. N. Lothrop,* and *Howard, Bishop & Holbrook* for complainants.

1. While the relation of attorney and client subsists, the former shall derive no advantage to himself from the contracts, bounty, &c., of the latter. — 1 *Story Eq. Juris.* § 310; 2 *Ves.* 200, *Sumn. Ed. note*; 18 *Ves.* 126; *Jac.* 322.

All dealings between attorney and client will receive the most rigid and sifting scrutiny from a court of equity. — *Story Eq. Juris.*, § 310, *et seq.*; 2 *Seld.* 272. — See also: 1 *Lead. Cases in Eq.* 132. In such cases it is not necessary for the client to prove fraud. Indeed it is not necessary, in all cases, that actual fraud should exist. In many cases relief has been given where the courts disclaim all imputation of fraudulent intent. — 1 *Cox*, 112. And in all such cases the *onus* of vindicating the entire fairness of the transaction is upon the attorney. He must show that he concealed nothing, misrepresented nothing, advised everything material. As it has been pointedly said, the attorney is bound to give, in such case, to his client, the same information and advice against himself that he would against a

third person. — See *Gibson v. Jeyes*, 6 *Ves.* 277; 9 *Ves.* 296; 13 *Ves.* 52; *Tam.* 421; *Cases Temp. Talb.* 111; 2 *Atk.* 29; 1 *B. & B.* 104; *Hunter v. Atkins*, 3 *M. & K.* 113; 2 *Clark & Fin.* 102; 2 *Y. & C.* 194; 2 *Y. & C.* 498; 23 *E. L. & Eq.* 132; 27 *E. L. & Eq.* 168; 12 *E. L. & Eq.* 316; 4 *Edw. Ch.* 599; 7 *Yerg.* 30; 11 *Paige*, 598; *Ibid.* 467; 5 *Denio*, 640; 17 *Ill.* 148; 1 *Dana*, 582; 5 *Johns. Ch.* 44.

2. But it may possibly be insisted that, even if the transaction was originally invalid, yet it has been subsequently *confirmed*, and for that reason can not now be avoided. The only testimony which shows that Gray & Co. ever knew what the particular facts were, is the testimony of Mr. Arnold to the conversation had with Mr. Gray, in Milwaukee, in May, 1853, while the Dowe suit was pending in the Supreme Court. This, however, was after the bond had been given, and after the trial in the court below. But this conversation can not be justly set up as a *confirmation* of the transaction. — 1 *Ves. jr.* 215; 4 *Dessaus.* 706. No act will work a confirmation, unless the subject does it after the original influence is entirely removed, and he fully understands his rights, and entirely comprehends the effects of his action.

3. There is still another view of this matter. This bond was an indemnity against the *wrongful* and *unauthorized* act of defendants. The act of defendants was a tort, — a trespass, — not necessary to the assertion of the rights of Gray & Co., and not directed or advised by them. The bond, therefore, is void for *want of consideration*. There was certainly no valuable consideration for this bond; and it can hardly be pretended that there was any *moral* consideration. ₁But even if there was a *moral* consideration, it would give no validity to this bond. — 9 *M. & W.* 501; 11 *Ad. & E.* 438; 7 *Man. & Gr.* 807; 3 *Pick.* 207; 24 *Wend.* 98; 2 *Barb.* 420.

Now it is well settled, that no action for contribution can be maintained between *joint tort-feasors*. *Willard Eq.*

GRAY *v.* EMMONS.

107, *and cases cited;* 8 *T. R.* 188; 1 *Edw., Ch.* 212, *and cases cited therein;* unless where one acts under the direction of, or for another, supposing that the act done is innocent and lawful.— 4 *Bing.* 66; 10 *Cush.* 287; 2 *O. S. R.* 203. But to entitle an agent to claim compensation for a loss, he must show that it arose directly and naturally from the *execution of the agency;* that the act done, was really by the authority of his principal; and the agency was the *cause,* and not merely the *occasion,* of the loss.— *Story Agency,* § 341; 26 *Ala.* 633. Any security given by one tort-feasor to another, for a share of the damages caused by the tort, would be void in all cases of deliberate and wilful tort, though it might be otherwise in favor of parties supposing that they were doing an innocent and lawful act. —See 1 *Yelv.* 197.

If such is the law relative to joint tort-feasors, it seems to us there can be no doubt what must be the rule, where a tort-feasor seeks to shoulder the penalty of his wrong on to innocent parties. An indemnity obtained in such case by an attorney from his client, is not only clearly gratuitous, and therefore void for want of consideration, but it is censurable as a flagrant abuse of a confidential relation; that relation too, which, more than any other in life, in matters pecuniary, places one man in the power and within the influence of another. And, therefore, for the gravest reasons of public policy, all such indemnities should be held void.

*A Pond* for defendants.

[Mr. Pond's brief has not been furnished to the reporter. He insisted, among other things, that the case upon the bill was one of *actual, positive fraud,* in procuring the bond, and that the court could not give complainants relief unless this case was found to be sustained by the evidence. Complainants can not now abandon the case made by the bill, and claim relief upon a distinct ground; namely, upon the relation existing between the parties at the time the bond was given.]

MANNING J.:

The objection at the hearing, that the bill is not so framed that relief can be given on the relation of the parties, we think is not well taken.

It appears from the bill the bond was not only given while the relation of attorney and client existed, but with reference to business then in the hands of Emmons & Van Dyke as attorneys for complainants, who executed the bond after it had been drawn up and sent to them for that purpose by defendants, relying upon and reposing confidence in them; and relief is asked on the ground that defendants have brought action on the bond, to indemnify themselves against the consequences of an act of theirs, done without authority from, and not in the performance of their duty to complainants, when the bond was given for a different purpose. Such is the ground-work or *substratum* of the bill, and the case is one proper for relief, if sustained by the proofs.

It is the policy of the law to scrutinize gifts, conveyances, and securities, given by a client to his attorney pending the relation, more especially when they are connected with the subject matter of litigation; as then the necessities of the client, and the confidence reposed, place the client most in the power of his attorney. The relation, and the confidence it implies, which confidence is absolutely necessary, in some cases, to promote the prosecution or defense of a suit, are frequently not so much matter of choice with the client, as of necessity. Hence the reason and justice of the rule of law, that will not permit them to be turned to the profit of the attorney, at the expense of the client.

It was the duty of defendants, after a sufficient quantity of the mortgaged property was sold to satisfy complainant's claim, to have returned the rest of it to Dowe. This they did not do, and the consequence was, Dowe recovered

a judgment against them for its value, in the trover suit. Had they returned it to Dowe, they would not probably have been sued; or, if he had sued them, they would have had a good defense, as the final determination of the trover suit abundantly shows.

They deny authorizing Wall, the auctioneer, to sell this part of the property. But his testimony is against them on that point. He says they did.

They also insist they had a right to sell the whole of the. property, under the assignment from Dowe to complainants, and, after paying complainants, to return what was left of the proceeds to Dowe. Unfortunately for them the law was held to be against them on this point in their suit with Dowe.—*Emmons v. Dowe*, 2 *Wis.* 322. But it may be said, and we admit the force of the objection if the case before us is one proper for its application, that an attorney is not to be held responsible to his client for his opinion on a point of law. This is generally true, where the law is doubtful, and the attorney acts in good faith, although it may afterwards turn out that he was in an error. But we do not think the principle applicable to the present case. There is no evidence before us that, among good practitioners at the bar in Wisconsin, there was a reasonable doubt in regard to the law, previous to the decision against them in the trover suit. And even if there was, defendants do not appear to have acted under a misapprehension as to what the law was, in ordering the goods to be sold. In the letter to complainants of September 25th, 1851, they say "to-morrow we shall have had delivery from the marshal" (that is, in the replevin suit) "and we shall then immediately *advertise and sell sufficient of the stock* to pay the amount secured by the mortgage, thirty-nine hundred dollars." Here is a clear recognition of the rights of complainants, under the assignment from Dowe, to have so much of the mortgaged property sold as would satisfy their demand;

and no intimation whatever of selling the whole of the property, and paying the excess of the proceeds to Dowe, after paying complainants.

From the evidence it is highly probable defendants were misled by Waldo, who appears to have held himself out to them as the agent of Dowe, into giving Wall instructions to sell the remaining property (for it was not all sold at one time) after the sale made to pay complainants. This, however, lays complainants under no equity to indemnify them against the Dowe judgment. They had but one duty to perform after the first sale; and that was to return the residue of the property to Dowe. They were misled, it is true, by Waldo, into doing as they did; but complainants are in no way accountable for Waldo's conduct. Nor are they in equity and good conscience under obligation to re- lieve defendants by taking the burden from their shoulders on to their own. In justice to all parties, in such circum- stances, we think the misfortune should rest where it has fallen.

It is said the bond was given with a knowledge of all the facts of the case. We do not think this is sustained by the evidence. It was given long after the property had been sold, of which fact complainants had been advised by letter. But they had also been advised by defendants that Dowe was proceeding for all of the goods, and not for those only that had been sold after their demand was satisfied. Their object in giving the bond was to receive the balance of their claim, amounting to some eleven hundred dollars, which defendants had in their hands, and which they claimed a right to retain by way of indemnity against the Dowe suit. And the bill states the bond was given to indemnify defendants only against what Dowe might recover against them for the goods sold to pay complainants; and witnesses have been examined to prove this part of the bill. We shall not, however, go further into this part of the case, as it is unnecessary.

GRAY v. EMMONS.

Complainants' right to relief is in no way affected by their employing counsel to attend to the suit on the writ of error in the supreme court, nor by what they did to compromise it. There is no evidence they, at that time, knew what their rights were. They undoubtedly supposed themselves bound by their bond.

Besides, the bond was without any consideration whatever, other than the supposed liability of defendants to Dowe for the goods sold to pay complainants' demand.

The decree below must be reversed, and a decree be entered in accordance with the prayer of the bill.

MARTIN CH. J., and CHRISTIANCY J. concurred.

CAMPBELL J. did not sit, being a nominal party to the record.