## ORPHANS' COURT OF BALTIMORE CITY.

Filed November 9, 1900.

IN RE ESTATE OF CHARLES LEONARD HARBAUGH, DECEASED.

*John B. McGraw, William Corkran Clift* and *Garnett Y. Clark*, for the petitioner, Edward McC. Harbaugh.

*Olin Bryan* for Dr. Casper F. Jones, *Roger W. Cull* for Edmund J. McGraw, *Isaac Lobe Straus* for Quinn & Winternitz, *Robert H. Carr, Jr.*, for Paul Quinn, *Towers & Bramble* for Bruno Richter, *James J. Canton* for Michael A. Canton, respondents.

Argued before SAVAGE, C.J., BLOCK and O'BRIEN, JJ.

SAVAGE, C. J.—

The facts and the questions of law which are now before us for review, decision and judgment have been

brought to our attention in connection with a petition under oath, filed in this Court on August 20th, 1900, by Edward McC. Harbaugh, a resident of Mechanicsburg, Ill., and the surviving brother and sole distributee of Charles Leonard Harbaugh, deceased, wherein, after detailing at considerable length the successive steps which resulted in his coming to Baltimore in company with Charles Winternitz, attorney-at-law, and partner of Augustin Quinn, attorney-at-law, under the firm name of Quinn & Winternitz, and of Edmund J. McGraw, an appraiser of this Court, he charged that Winternitz and McGraw had made certain false and fraudulent statements to him in Springfield, Ill., and had prevailed upon him to sign a power of attorney, and later a contract for compensation, to be paid Quinn & Winternitz; and he also charged that McGraw, Quinn & Winternitz had entered into a conspiracy to defraud him, and had defrauded him, out of a large sum of money, and that Dr. Casper Frank Jones, the administrator of his brother's estate, duly appointed by this Court, had entered into and aided them in the perpetration of the fraud. He further alleged that Bruno Richter, Michael A. Canton and Paul Quinn had acted as co-conspirators. It is not necessary to here fully detail the allegations of the petition in view of the fullness of the opinions herein filed. The petitioner only prayed that the first administration account of the administrator be reopened and set aside, that he be removed, his commissions disallowed and a new administrator appointed. All the answers were also under oath. Quinn & Winternitz filed separate answers. Mr. Quinn admitted that he received a check drawn to the order of Quinn & Winternitz for $8,700.00, and alleged that it was distributed according to a contract entered into by Quinn & Winternitz with Harbaugh, and he averred that his firm had received an additional $500.00 from C. Frank Jones, administrator, and were ready and willing to distribute it upon final settlement, according to said contract. Mr. Quinn characterized the allegations of conspiracy and fraud as "absolutely false and untrue," and in conclusion submitted that this Court has "no power to inquire into the contractual relations" existing between him and Mr. Harbaugh.

The answer of Mr. Winternitz denied the main allegations of the petition, claimed that Mr. Harbaugh had throughout acted freely, and had expressed himself satisfied, and that all his firm had received had been in accordance with the contract made with Mr. Harbaugh. He detailed the occurrences in Springfield and Baltimore. He averred that "to charge him with conspiracy and fraud is a cowardly, wicked, villainous and malicious falsehood, without the slightest truth or foundation," and he denounced it as "a foul, bold, and dastard plot concocted for the purpose of blackmailing, vilifying, degrading, humiliating, and blackening his character." He then complained that the petitioner's attorneys had instituted their proceeding "without giving him the slightest warning," and averred that they had "violated every principle of professional courtesy" and treated him "most shamefully." He further said that "his entire dealings with the said Harbaugh were honest, just, upright, and honorable, and that he did not take the slightest advantage of him, and that whatever was done was with his consent and full knowledge." He also denied the power of this Court to inquire into his "contractual relations" with Harbaugh.

Dr. Jones denied in his answer, that there was any collusion on his part with any of the parties named, and stated that "they were mostly strangers to him, that he never had any conversation with either of them in reference to the disposition of the estate of the deceased, Charles Leonard Harbaugh, that he had no knowledge whatsoever of any agreement or understanding existing between the attorneys of the said Edward McC. Harbaugh and the said Edward McC. Harbaugh himself; that he acted in perfect good faith, stating fully and freely the exact status and condition of the estate, that he had not concealed or undertaken in anywise to cover, or fail to disclose anything in reference to the estate; that what he did in reference to the settlement of the estate, was done solely and alone for the purpose of accommodating Mr. Harbaugh, without motive of gain or undue advantage, and with no purpose whatever of practicing any fraud on him, but to the contrary with perfect fairness in all things appertaining to the said estate."

In conclusion, Dr. Jones submitted that the petitioner in the face of the execution of his release, the contents of which, he had full knowledge, of the information he received from him concerning the estate, and of the fact that all that he (Dr. Jones) had done had been done by and with his approval, or by and with the approval of his attorneys, clothed with full power of attorney, and with his full knowledge is not now in a position where he can seek to have his administration account set aside. He asked that the petition be dismissed.

Mr. McGraw admitted in his answer that he had been "employed" for the purpose of identifying the petitioner as a brother of the deceased, and that he accordingly went to Springfield, but he denied that he had made any false statements to Mr. Harbaugh, or had in any way influenced him to sign the power of attorney or the contract.

Paul Quinn, Michael A. Canton and Bruno Richter filed separate answers containing general denials.

We have appreciated from the day Harbaugh formally invoked our authority and interposition the gravity of the charges made in his petition, and we have fully realized that they seriously affect no less than four officers of this Court, namely: an appraiser of this Court, an administrator appointed by us, and two attorneys-at-law, who, in, their professional capacities, are officers of this Court. We have also well understood that the administration of justice in this Court was involved, and that it behooved us to be calm, resolute and judicially conscientious in the discharge of our duties in the premises.

In order that the hearing and arguments might be as full as could be expected or desired, we heard the witnesses without limiting their testimony and allowed the introduction of evidence, save as, in our judgment, the rules of evidence, liberally interpreted, required us to exclude what was clearly irrelevant or inadmissible; and we also heard the attorneys who expressed a wish to address us without abridging the time in which to present their views. We thus gave to all interested parties the amplest opportunity to fully inform and instruct us, as they and their attorneys could reasonably consider necessary. We have since the close of the arguments re-read the stenographically reported testimony contained in nearly one thousand pages of typewriting, and have carefully examined and considered the numerous authorities cited, which were pertinent. We have also made our own examination of the decisions applicable to the facts and parties before us. We have had no hesitation in determining that the charge of conspiracy to defraud made by Mr. Harbaugh has not been sustained. On the contrary it has been abundantly proved that there was no collusion, communication, knowledge of persons and facts, acquaintanceship, motive, or prior or subsequent conduct which would justify an inference of a conspiracy to defraud the petitioner. The wrongs done him were prompted by greed and consummated in misrepresentation, deception and fraud, but they were effected without the formation of a conspiracy as charged. We have also had no difficulty in deciding that the respondents, Michael A. Canton and Paul Quinn were not only not co-conspirators, but they were not at Ferry Bar on the day named, had then never seen Harbaugh, and then knew nothing of Harbaugh or the case before us; and that Captain Pumphrey and Detective Kohler of this city were there on that day, on official business, and there met Mr. Harbaugh as he and they testified. He recalled and identified those well known detective officers when they appeared before us, and said under oath that he had never seen Michael A. Canton or Paul Quinn, until they were pointed out to him in our presence, furthermore, we exonerate Bruno Richter from the charge of conspiracy to defraud. He satisfactorily explained his limited and unimportant connection with the matters into which we inquired. Canton, Paul Quinn and Richter should not bear any of the costs incurred in this case.

We wish to here note the suggestion made in argument by one of the attorneys for the respondents, that this Court might be vexed at Harbaugh for petitioning this Court and so long occupying its time. The moment C. Leonard Harbaugh died intestate at his home in this city (alone and under distressing circumstances) the rights of his brother and sole heir at law, the petitioner in this case,

attached, and he and his rights were under the protection of this Court and all its officers, and of the laws of Maryland. This Court was immediately open to him, as it is at all times to all who have rights secured to them by law or treaty. It is the high duty of this Court to hear patiently and fully all who seek its advice, aid or protection. We will always cheerfully perform that duty. We commend Mr. Harbaugh for bringing before us this case and the wrongdoers against whom he has rightly complained, and we must condemn the appraiser of our Court, and Messrs. Augustin Quinn and Charles Winternitz who officiously and wrongfully injected themselves into the settlement of the estate of C. Leonard Harbaugh after its administration had been begun, for the sole purpose of pecuniary gain, and have thereby interrupted, embarrassed and aggravated what would have otherwise been a quiet, regular, and rightful administration without vexation, unnecessary expense, or wrong to any one.

We will first consider and dispose of the case of Edmund J. McGraw, one of the two appraisers of this Court, who was selected and designated by us nearly a year ago; and we will premise our conclusion by stating that the duties of an appraiser are varied, responsible, and largely confidential; that we and the public must rely implicitly in the settlement of nearly every estate brought into this Court as required by law, upon his unfailing courtesy, fairness, intelligence, judgment, and discretion, his firmness whenever necessary, and his incorruptible and unquestioned integrity. He alone of all the officers of this Court is empowered by law to enter even the homes of the citizens of this great city, and to enquire minutely into their private affairs.

The completeness and correctness of the inventories made, signed and sworn to by him are all important in every view. Those inventories affect the property rights not only of adults and helpless minors but even of the unborn. We cannot review and know (save upon complaints which are seldom and always reluctantly made) what has been his conduct and findings. The acceptability and usefulness of an appraiser of this Court ends therefore whenever by an indiscretion he loses our entire confidence; and equally so when those who must do business in this Court in connection with the inventories and appraisements of estates do not fully trust him. The counsel for McGraw contended that he committed only an indiscretion, and also that he was acting throughout in his private capacity, and had a right to act. We have such kindly feelings for McGraw, founded upon pleasant personal relations, that we wish we could adopt the views of his able lawyer. It is only fair to McGraw to state that he made a fatal step and seriously compromised himself upon the solicitation of Winternitz, who sought him in the privacy of his office, solicited, persuaded and urged him to accompany him to Springfield, Ill., and offered and paid him money, namely, $50.00 for his services and $85.00 for his expenses. We wish we could separate McGraw from Winternitz in this case, but they are jointly culpable. McGraw had the same knowledge that Winternitz had, namely, that the estate in question was then in this Court and under its protection, that an appraisement of the two houses and the personal property so far discovered had been made by McGraw himself; that the rights of all parties interested in the estate would, in regular course, be amply protected and secured, and that it was the duty of the administrator and not of an attorney not employed by the administrator, much less of an appraiser of this Court, to discover and communicate with the heir or heirs; that there was no necessity whatever under the law or the circumstances for haste by any one; and that all he could be expected to do was, if called upon, to here identify Harbaugh, the petitioner, whom he happened to personally know, and then only as a kind act in aiding the administrator. McGraw's acceptance of employment by Winternitz, his presence in Springfield in company with him, his identification there of Harbaugh, and his admitted statement to Harbaugh that he was an appraiser of this Court and thus had official information of the value of the then appraised estate left by his brother, constituted a gross impropriety. His acts and statements combined to influence Harbaugh to confide in Winternitz, and whether so intending or not, he aided his then

employer, Winternitz, in obtaining from Harbaugh the power of attorney, and the agreement of which we will hereafter speak. His statement to Harbaugh in Springfield that he was not interested in his agreement with Quinn and Winternitz, and his refusal to even witness the signing of that agreement, do not suffice to relieve him. He ought not to have yielded at the outset to the seductive words and promises of his pretended friend, Winternitz. We do not believe McGraw realized the wrong he was doing, but we must remove him. No officer, clerk, or employee connected with this Court, or with the office of the Register of Wills, can be permitted to intermeddle in any way in the settlement of estates, or the business of this Court.

We will now consider a graver phase of this important case, viz: the participation of Quinn & Winternitz in the wrongs done Harbaugh. In our deliberate judgment the power of attorney and the contract obtained in Springfield from Harbaugh by Winternitz, there representing and acting for his firm, and which have been introduced by them in evidence, and are relied upon by them, were obtained under circumstances and by means which reflect very seriously upon their professional honor.

Let us now look closely at the main facts of which Winternitz had full knowledge when he went to Springfield, there met Harbaugh and solicited him to employ his firm. First, he had personal knowledge, gained from the records of this Court, that it had assumed jurisdiction, and had appointed and bonded an administrator, and that, therefore, there was no necessity for any attorneys to act for the protection of Harbaugh's interests in his brother's estate, whatever they might be. Secondly, he knew that all matters relating to the administration of estates in Baltimore City have been entrusted by law to this Court, and he must be conclusively presumed to have known, as an attorney at law, the powers and duties of this Court, and of administrators appointed by us, and also what rights, and what defenses if any should be necessary, Harbaugh had under the laws of Maryland.

It was his bounden duty to fully inform Harbaugh, before soliciting him to sign even the power of attorney, what his rights were under our laws, and what had been done and could be done by this Court and the administrator for his protection and the protection of all parties, in order that Mr. Harbaugh could, with full knowledge, determine for himself whether or not the services of an attorney were at all necessary to him at that time. Winternitz heard all the testimony in this case, and testified in his own behalf without limit or objection. There is no testimony to prove that Winternitz at any time, in Springfield or Baltimore, instructed Harbaugh, as it was his duty to do. Harbaugh did not and could not know his rights under our laws, or what would be the regular course of the administration of his brother's estate. He relied implicitly upon Winternitz to fully instruct him, and not to ignorantly or designedly fail in his duty to him and thereby mislead him. It was not sufficient for Winternitz to give Harbaugh the information he then had as to the estimated value of his brother's estate, and of the appointment of an administrator, and to apprise him of the threatened interposition of Mr. Heming of this city, who claimed to be a cousin of the deceased, but who could not, when on the witness stand, state what his relationship was, and he wronged Harbaugh by exciting his fears, even as to the possibility of a will being found, and any claims against the estate being made. If a valid will had existed and had been found, Winternitz would have been culpable in any attempt to forestall and defeat it by a hurried settlement, and leave Dr. Jones to bear the brunt; and if valid claims existed and had not been proved, Winternitz could not be excused for assisting or prompting Harbaugh to walk off with a share of the estate before the creditors had been paid. The initial fraud practiced upon Harbaugh was the obtention of the power of attorney. Harbaugh did not and could not understand that there was no need for it; Winternitz had not given him the facts and the law, as he should have done. Harbaugh has at no time stood in need of "contractual relations" with any attorney at law in the settlement of his brother's estate, more than he has of the prayers of an attorney at law for his salvation.

When attorneys at law inform, advise, warn, protect and defend clients and the public as they should they are admirable and praiseworthy; when they mislead, deceive and defraud they should be relentlessly and severely punished. It is the duty of an attorney at law, enjoined by the law and every impulse of honor, to withhold no essential information from his client whether he is sought by his client, or, as he properly may, seeks his client with knowledge of his rights and perils of which his client may be ignorant. But he must always so fully inform and advise his client that he can form a free, intelligent, and independent judgment. Especially is this true and obligatory when a court of administration has exercised jurisdiction, and appointed and bonded an administrator who is a trustee, and who must and can protect all interests.

Harbaugh could not rely upon his own judgment because he was unable to judge as to the value of the services proffered him, and could not know what legal steps, if any, would be necessary to be taken in the conduct of the administration. The advantage was overwhelmingly on the side of Winternitz. He possessed knowledge as an experienced attorney, familiar with the laws of Maryland, which Harbaugh could not possess. If he designedly withheld from Harbaugh, or failed to give him, full information in all particulars as to his rights and defences, and what would be the ordinary course of the administration of his brother's estate in this Court, he omitted to discharge a duty to Harbaugh before the signing of the contract, which must render it invalid. There is no proof in this case that he met that obligation or gave full information to Harbaugh at any time. The facts that he informed Harbaugh in Springfield of the appraised and estimated value of his brother's estate, as far as he then knew it, and that his partner and the administrator gave Harbaugh in Baltimore information of the discovery of the large sums of money found in six savings banks in Baltimore (which latter fact had already been published in the Baltimore newspapers), do not exculpate him or relieve him from the obligation the law imposed on him when he solicited Harbaugh as a client in Springfield, to give him the law as well as the facts. He did not at any time, make known to Harbaugh those absolutely material facts, and explain to him their meaning in the law.

It should be borne in mind that Harbaugh was a poor laboring man who had, as he testified, to work daily, at the age of fifty-four, for twelve hours for $1.50; that he knew very little of his brother's personal affairs; that his brother was so secretive that he had kept him in profound ignorance that he had any money in bank; that he had not seen his brother since 1896, when he visited him in this city; that he had had very limited and infrequent communication with him; that he had had no business experience which would serve him in such an emergency; and that almost any sum of ready money would appear large to him. If Harbaugh was influenced by cupidity those who wronged him cannot offer it as an excuse for their acts. His private character is not in question. We are to ascertain only his rights and his wrongs under Maryland law, and to defend the former and to remedy, as far as we can, the latter.

We will now examine, in the light of the authorities, the obligation imposed by law on Winternitz to deal with Harbaugh with absolute fairness. In the case of Jos. P. Merryman vs. John Euler, reported in 59 Md. 588, and in which our honorable associate, Judge O'Brien, was the attorney for Euler, the Court of Appeals unanimously decided that when the relation of client and attorney exists the law makes a presumption against the attorney in favor of the client, and that the onus is on the attorney to prove his entire bona fides and fairness in the transaction. In the case of Jacob S. Rosenthal vs. Mahon, 65 Md., 418, the Court decided that a contract which had been obtained by an attorney at law by means of fradulent devices practiced on his client, allowing the attorney 15 per cent. of an estate then being administered in this Court, was fradulent and void.

In Wamsley vs. Booth, 2 Arkyns, 27, Lord Hardwicke says: "There is a strong alliance between an attorney and his client, and a great obligation upon the attorney to take care of his client's interests, and the Court will relieve a client against the extortion

of an attorney." All the authorities concur that the highest degree of fairness and good faith is required from an attorney towards his client, and that all their dealings will be closely scrutinized, and that no contract between them will be upheld where any undue consequences result to the attorney. Weeks on Attorneys, 441, 450, 451, Story Eq. Jur., secs. 312a, 312b, 312c, and the authorities there collected; and Kerr on Fraud and Mistake, 151, 161, 163 and 168. The attorney is supposed to have an ascendancy over the client because of his relation to him, and can easily impose on his credulity; therefore, transactions which would be open to no objections where no such relation exists will be held invalid as against a client. It is a rule of public policy. Gray et al. vs. Emmons et al., 7 Mich., 533; Brown vs. Bulkley, 1 McCarter, Chy., 14 N. J., 451. Contracts between lawyers and clients are subject to a severer scrutiny than those of ordinary men. Downing vs. Major, 2 Dana, 228.

In Elmore vs. Johnson, 141 Ill., 513, the Court, in speaking of the relation which exists between attorney and client, says: "That relation is one of confidence and gives the attorney great influence over the actions and interests of the client. In view of this confidential relation, transactions between attorney and client are often declared to be voidable which would be held unobjectionable between other parties." The law is thus strict "not so much on account of the hardship of the particular case, as for the sake of preventing what might otherwise become a public mischief." (Lewis vs. J. A., 4 Edward Ch. Rep. Marg. page 599, top page 822.) "No single circumstance has done more to debase the practice of the law in the popular estimation and even to lower the lofty standards of professional ethics and self respect among members of the legal profession in large portions of our country, than the nature of the transactions, often champertous, between attorney and client, which are permitted and which have received judicial sanction." (3 Pomeroys Eq. Jur. sec. 960, note 1).

The law watches with unusual jealousy over all transactions between the parties which occur while the relation exists. In Lecatt vs. Sallee, 3

Porter 124, the Supreme Court of Alabama (in 1836) said: "Integrity of character and purity of motive have never enabled such contracts to stand in full force against the principle of equity which commonly excludes all enquiry into the fairness of the transaction, and sets them aside as violations of the policy of justice. No principle has been more rigidly adhered to by the English Chancellors; and we shall not take the liberty to depart from it."

Again in Elmore vs. Johnson, supra, the Illinois Court said that in the case of a purchase by an attorney from his client, "the transaction is presumptively fradulent, and the burden is on the attorney to show fairness, adequacy and equity." Lewis vs. J. A., supra. He must remove the presumption against the validity of the transaction "by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, knowledge, intention, and freedom of action by the client, and also that he gave his client full information and disinterested advice." (2 Pom. Eq. Jur. sec. 960).

In Felton vs. LeBreton, 92 Cal. 457, it is well said that "while an attorney is not prohibited from having business transactions with his client, yet inasmuch as the relation of attorney and client is one wherein the attorney is apt to have a very great influence over the client, especially in transactions which are a part of or intimately connected with the very business in reference to which the relation exists, such transactions are always scrutinized by Courts with jealous care, and are set aside, at the mere instance of the client, unless the attorney can show by extrinsic evidence that his client acted with full knowledge of all the facts connected with such transaction, and fully understood their effects; and in any attempt by the attorney to enforce an agreement on the part of the client, growing out of such transactions the burden of proof is always upon the attorney to show that the dealing was fair and just, and that the client was fully advised. In the words of Lord Eldon, he must make it manifest that he gave to his client, "all reasonable advice against himself, that he would have given him against a third person." (Gibson vs. Jeys, 6 Ves. 278).

And in 99 Cal., Cox vs. Delmas, 104, occurs this strong language: "The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientous fidelity—uberrima fides."

We need not add authorities, as we could easily do; the law has been too long understood and applied to make it necessary. But we wish to give two high authorities on misrepresentation and suppression, both of which enter into this case as it relates to Winternitz and Quinn.

In Pulsford vs. Richards, 17 Beaver 96, Sir John Romilly, the learned master of the Rolls, said: "With respect to the character or nature of the misrepresentation itself, it is clear that it may be positive or negative; that it may consist as much in the suppression of what is true, as in the assertion' of what is false; and it is needless to add that the person deceived entered in the contract on the faith of it. To use the expression of the Roman law it must be a representation dans locum contractui, that is, a representation giving occasion to the contract; the proper interpretation of which appears to be the assertion of a fact on which the person on entering into the contract relied, and in the absence of which it is reasonable to infer that he would not have entered into it; or the suppression of a fact knowledge of which, it is reasonable to infer, would have made him abstain from the contract altogether."

Misrepresentation may consist as well in the concealment of what is true as in the assertion of what is false. If a man conceals a fact that is material to the transaction, knowing that the other party acts on the presumption that no such facts exist, it is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated. Kerr on the Law of Fraud & Mistakes, 94. Fraud may be committed by silence when it was a duty to speak. Fraud is indefinable. It vitiates all contracts.

It is important to determine when the relation of attorney and client was established between Quinn & Winternitz and Harbaugh, and we have given it due consideration. We are of the opinion that when the power of attorney introduced into evidence was signed by Harbaugh, the relation was consummated. 3 Ency. of Law (2nd ed.) 316; Denizel vs. City & S. Ry. Co., 90 Md., 442.

Winternitz so treated it by speedily mailing it to Quinn in Baltimore, and telegraphing to him of its execution, and that it had been mailed, and also by offering and relying upon it when he called in Baltimore on Mr. Bryan, attorney for Dr. Jones. If no other paper had been signed, Quinn & Winternitz could have recovered reasonable compensation on a .quantum meruit for services performed under it—provided it had not been fradulently obtained. The subject of compensation was not mentioned between the parties for several hours after the power of attorney had been signed, and then the unilateral contract was signed by Harbaugh.

We are without jurisdiction to construe the contract offered in evidence and order restitution. A Court of Equity must be invoked.

It remains for us to say that although Quinn was not as active as was Winternitz in this matter, he originated, encouraged and approved his co-partner's acts, and has received his share of the money paid his firm; and that he is, therefore, equally as culpable as is his co-partner.

We have another unpleasant duty to perform in reference to Quinn & Winternitz. The Legislature of this State at its last session, (Laws of 1900, Ch. 309), added the following additional sections to the Code of Public General Laws of the State of Maryland, Art. 10, title "Attorneys at Law and Attorneys in Fact," which were originated and formulated by this Court:

"11A. Disbarment of any attorney-at-law from the right to practice the profession of law by a Circuit Court for any county of this State, or by the Supreme Bench of Baltimore City, shall extend to and include disbarment from the right to practice the profession of law in the Orphans' Courts of the several counties of this State and the Orphans' Court of Baltimore City; and the Orphans' Courts of the several counties of this State and the Orphans' Court of Baltimore City shall disbar from the right to practice the profession of law in

their respective courts all attorneys who shall have been disbarred from the right to practice the profession of law by a Circuit Court of this State, or by the Supreme Bench of Baltimore City.

"11B. It shall be the duty of the Judges of the Orphans' Courts of the several counties of this State, and of the Judges of the Orphans' Court of Baltimore City, to prefer charges, in writing, against any attorney-at-law who shall have, in their judgment, been guilty of unprofessional conduct occuring in their respective Courts, or, in connection with the business thereof, to the Circuit Courts for the county in which such Orphans' Court shall have jurisdiction, or to the Supreme Bench of Baltimore City, as the case may be."

Sec. 11B is now before this Court for the first time for construction and application. It was contended by the learned attorney for Quinn and Winternitz that we are not required by that section to take action thereunder against his clients because the "business" therein contemplated was to be only in reference to matters which were strictly within the limited administrative jurisdiction of this Court, as set forth in Art. 93 of the Code of Public General Laws; and that inasmuch as the relations of Quinn and Winternitz to the matters of administration then under the jurisdiction of this Court, were solely professional, this Court had no administrative "business" which was effected thereby.

We can not admit the correctness of that contention. The section was intended to give, and we believe it does give, to the Orphans' Courts of this State jurisdiction, under Article 10 of the Code, over attorneys at law who are in their judgment guilty of unprofessional conduct in connection with any matters of administration entrusted by law to them, and the word "business" includes all matters of which at any time they can take judicial cognizance in order to determine whether or not there has been unprofessional conduct. Certainly in this case, Quinn & Winternitz interposed and became involved in the administration of an estate over which we had assumed active control. Our view of the law is that we may, of our own motion, enquire into the apparent or alleged unprofessional conduct of any attorney at law, who becomes interested, professionally, in the administration of an estate which is placed by law under our protection. We believe that it was the intention of the Legislature, as it was ours when we framed the statute, to give us broad powers over attorneys in the administration of justice, in deciding whether or not they have been guilty of unprofessional conduct. We will, without delay, formulate charges of unprofessional conduct against Quinn & Winternitz, and transmit them to the Supreme Bench of Baltimore City for its action.