THE UNION MUTUAL LIFE INSURANCE COMPANY

*v.* ·

ELIZABETH KIRCHOFF.

*Filed at Ottawa June 12, 1890.*

1. AGENCY—*acts of agent binding on principal.* A person acting as the financial agent of an insurance company, who is entrusted with the management of the company's loans, securities and real estate, when acting within the scope of the apparent power, will bind his company by his acts.

2. SAME—*ratification by principal—by accepting benefits of agent's acts.* A principal can not be allowed to accept and hold a deed made by a party under a contract with his agent, and at the same time repudiate the agreement made by his agent. By retaining such deed, and the rights thereby obtained, he will ratify the acts of his agent, and be compelled to perform the contract on his part. ·

3. REDEMPTION—*sale under mortgage—redemption of a part—extension of time.* Where a tract of land has been sold for a specified amount of money, in satisfaction of a mortgage, and the mortgagor seeks to redeem, in the absence of any agreement between him and the mortgagee to the contrary, the mortgagor will be required to redeem the entire tract sold, and pay the whole mortgage debt. But it is competent for the parties to agree to extend the time of redemption, or to give the privilege to redeem a part, only, of the mortgaged premises.

4. SAME—*agreement for redemption or re-purchase—validity.* After bill filed to foreclose a deed of trust upon several tracts of land belonging to a married woman, including her homestead and that of her husband, a settlement was had with the holder of the mortgage, by which it was agreed that the mortgagors (the husband and wife) should make a quitclaim deed for all the property to the mortgagee in payment of the debt, and in consideration of the sale to the wife, of the homestead, and certain other property, for a sum stated, a stipulated amount to be paid annually : *Held,* that the agreement for the re-purchase or redemption by the wife was valid and enforcible.

5. CONSIDERATION—*named in a deed—whether conclusive.* The consideration named in a deed has never been regarded as conclusive on the parties thereto. While parol evidence is not admissible to vary or contradict the terms of a deed or other written instrument, yet such evidence may be introduced to show the true consideration of a deed, although it may be different from that named in the deed.

6. A quitclaim deed given by a mortgagor and wife to the mortgagee, recited, "this conveyance is given and accepted in satisfaction of certain indebtedness." The grantee insisted that this recital estopped the grantors from showing that the consideration was the right to redeem a part of the premises: *Held*, that the recital related to the consideration of the deed, and as it was not conclusive there could be no estoppel.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

Messrs. GROSSCUP & WEAN, for the appellant:

Was any contract for redemption or reconveyance finally concluded between the parties? A principal is not legally bound by the unauthorized act of his agent. At most he is only estopped from denying the authority of such act where third persons have been misled, to their prejudice, by the appearance of authority held out. Mechem on Agency, secs. 289, 290.

In this State a mortgage passes the legal title in the premises as security for the debt, reserving to the mortgagor the right to defeat such title by payment of the debt. Bispham's Eq. sec. 151; *Carroll* v. *Ballance*, 26 Ill. 9; *Jackson* v. *Warren*, 32 id. 331; *Harper* v. *Ely*, 70 id. 581.

There can be no division of the tract, part of which shall be redeemed and part remain unredeemed, or division of the debt, and the payment must be in money. Jones on Mortgages, secs. 1070, 1072; *Insurance Co.* v. *Slee*, 110 Ill. 41.

Warfield and Kendall had no legal authority to make the alleged agreement, and it, not being in writing, is within the Statute of Frauds.

The quitclaim deed of appellee was not given on the consideration of the alleged contract exclusively, and appellee is estopped by the recitals of the quitclaim deed from setting up the alleged agreement.

Mr. W. S. Harbert, and Mr. George R. Daley, for the appellee:

The contract is not within the Statute of Frauds. Reed on Statute of Frauds, sec. 533; *Lantry* v. *Lantry*, 51 Ill. 458; *Fischbeck* v. *Gross*, 112 id. 208; *Farwell* v. *Johnston*, 34 Mich. 343.

The appellant is bound by the acts of the agents within the scope of their implied authority. Story on Agency, secs. 443, 127; Bateman on Agency, 74, 80; *Anderson* v. *Coonley*, 21 Wend. 279; *Insurance Co.* v. *White*, 106 Ill. 67; *Insurance Co.* v. *Chestnut*, 50 id. 111.

By its silence, and by accepting the benefit of appellee's performance, the company is estopped from denying the agent's authority. Ewell's Evans on Agency, 65.

When the agent transcends his authority, it is the duty of the principal to repudiate the act as soon as he has been informed of what has been done, else he will be bound by ratification, by implication. Ewell's Evans on Agency, 68; *Ward* v. *Williams*, 26 Ill. 447; *Searing* v. *Butler*, 69 id. 575; *Railway Co.* v. *Elliott*, 76 id. 67.

The execution and delivery of the quitclaim deed was a sufficient part performance to take the case out of the Statute of Frauds. Pomeroy's Eq. Jur. secs. 1409, 134, and note; *Williams* v. *Stewart*, 25 Minn. 516.

A mortgagee may release by a sufficient parol agreement, although the debt be unpaid. *Wallis* v. *Long*, 16 Ala. 738; *Headley* v. *Groundry*, 41 Barb. 279.

An agreement by a mortgagee to take other land, and a claim against a certain meeting-house committee, in satisfaction of the mortgage debt, discharged the mortgage. *Simmons* v. *Brown*, 18 Vt. 231.

An agreement to apply a bill for work done for the mortgagee, upon the mortgage debt, is binding, and releases the debt *pro tanto*. *Hartley* v. *Tatham*, 1 Rob. 246; *Doody* v. *Pierce*, 9 Allen, 141.

The mortgage may be discharged by payment of the mortgage debt in notes. *Collamer* v. *Langdon,* 29 Vt. 32; *Mattix* v. *Weand,* 19 Ind. 151; *Hadlock* v. *Bulfinch,* 31 Me. 246.

But it is said that the mortgage debt was not paid. It is true, the money was never paid, but that which the parties treated as its equivalent was paid. A deed in fee simple was given for the property. When the note was thus paid off, we can not see how any vitality could remain in the mortgage that was given solely for the purpose of securing the payment of the note. *Jennings* v. *Wood,* 20 Ohio, 261; *Dexter* v. *Arnold,* 1 Sumn. 109; *St. John* v. *Bumpstead,* 17 Barb. 100; *George* v. *Wood,* 11 Allen, 41.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by Elizabeth Kirchoff on the 12th day of June, 1882, against the Union Mutual Life Insurance Company, to redeem lots 2 and 4, block 21, in canal trustees' subdivision of a certain quarter-section of land in Cook county, to which the company acquired title under a quitclaim deed from complainant and her husband, and under certain foreclosure proceedings in which she, her husband, and others, were defendants.

The record is quite voluminous, but the facts, briefly stated, are substantially as follows: On the 8th day of May, 1871, Julius Kirchoff, complainant's husband, borrowed of the insurance company $60,000, and to secure the payment, he and Elizabeth Kirchoff, and her mother, Angela Diversey, executed their joint note. Kirchoff and wife executed a deed of trust on all real estate they owned, including the two lots,—their homestead. Mrs. Diversey also executed a deed of trust on lands owned by her, to secure the loan. In 1877, default having been made in the payment of the money, negotiations were commenced with a view of a renewal of the loan on long time, at a reduced rate of interest. These negotiations did not prove

successful, and an effort was then made for a settlement by having the mortgagors surrender all or most of the property in payment of the debt. In the meantime, judgment was rendered against Mrs. Diversey, on the note, by confession, and in July, 1878, bills were instituted in the Circuit Court of the United States, to foreclose the two trust deeds. In the trust deed executed by Mrs. Diversey, a part of the premises belonging to her were incorrectly described, and in the bill to foreclose, the company sought to correct the error. Mrs. Diversey put in an answer, denying any mistake in the description, and set up other matters of defense. On January 1, 1879, Kendall, the attorney of the insurance company in Chicago, wrote the company that, in his opinion, an offer to Mrs. Diversey to let her retain forty acres of the land would induce her to give the company a deed of the balance of the property; that Kirchoff would surrender all his property, and make an arrangement to buy back his homestead at a liberal price, but "I do not dare to settle with him without settling the whole case," as Mrs. Diversey's matters may be complicated by any settlement with Kirchoff. To this the company replied: "If settlement can be made of all complications, etc., and with quitclaims from all parties, we will consent to let her keep forty acres." A short time after this,—about the 9th day of June, 1879,—a settlement was made, and in September, 1879, Mrs. Diversey conveyed to the company all the land named in the trust deed, which she owned, except the forty acres, and that was released to her. At the same time, complainant and her husband, by quitclaim deed, conveyed to the company all the land named in the trust deed they had executed to the company.

Thus far there seems to be no substantial dispute between the parties, but in reference to what arrangement was made between the complainant and the insurance company, under which she quitclaimed all the property described in the deed of trust, to the company, and allowed a subsequent decree of foreclosure to be entered, the parties do not agree. The com-

plainant insists that during the preceding negotiations it was agreed, in consideration of her quitclaim deed, the appellant would reconvey to her two lots heretofore described, one of which was then occupied as her homestead, the other cornering upon it; that the price at which the reconveyance should take place was their valuation at a previous appraisement by James H. Rees, namely, $7500 and $2500, respectively, and that complainant was to execute, in payment therefor, her notes for $10,000, extending over a period of ten years, bearing interest at six per cent, and secured by a mortgage upon the two lots. The insurance company, on the contrary, contends that no such agreement was ever concluded, and that if it was, complainant is not, under all the facts, entitled either to redemption or a decree for specific performance.

During the time the negotiations were in progress which resulted in the settlement under consideration, Edwin A. Warfield was the financial agent of the Union Mutual Life Insurance Company, at Chicago, and Robert B. Kendall was the attorney of the company in charge of its business. After the settlement had been concluded, it turned out that certain incumbrances existed against some of the property, which were subsequent to the trust deed, but which would take priority to the quitclaim deed executed by complainant and her husband. It therefore became necessary, in order to obtain a perfect title, to go on with the foreclosure proceedings, which was done. A decree was rendered, the property was sold, and upon the expiration of the time of redemption a master's deed was executed.

In order to establish an agreement under which the complainant was entitled to redeem, reliance is placed mainly upon the evidence of three witnesses—Julius Kirchoff, Edwin A. Warfield and Robert B. Kendall. The first named witness testified that he had authority from his wife to settle the matter for her, and in all he did he acted as her agent; that the company filed a bill to foreclose the mortgage in July, 1878.

He further testified: "About the time the bill was filed to foreclose the trust deed, I made a contract with the defendant looking toward a settlement. They wanted a quitclaim deed on the consideration of the two lots known as the homestead, and we gave a quitclaim deed in 1879, we agreeing to pay them for the homestead whatever the appraisal should be. The corner lot was appraised at $7500, and the other at $2500, (total $10,000,) to be paid in ten years—$1000 a year. They agreed to it, and we gave them a quitclaim deed. Some time after that they tried to foreclose. I asked Mr. Warfield what they meant. He said: 'It is exactly the same as we made the contract, and is all right. It is better to have it foreclosed to keep the mortgage safe for us.' I saw Mr. Kendall, the lawyer of the company. He said there were some judgments against that property, and to make it safer they had to foreclose, and that I need not be afraid—it would be all right. They told me they made out the deeds and sent them to their main office. When they came back, during that year, they were to be delivered to us on payment of $1000. It took some time, on account of the foreclosure. It was at six per cent interest. Mr. Warfield first saw me in relation to getting a quitclaim before the foreclosure proceedings were commenced. We were to relinquish everything except the homestead—give them a quitclaim, and keep the homestead—the two lots. We were to give a quitclaim deed to everything, including the homestead lots, and redeem the homestead at the appraised value—$7500 for one lot and $2500 for the other. They were to make a deed out, and send it to the company, and upon its return, deliver it to us at any time during the year, and we were to pay $1000, and $1000 a year thereafter, until $10,000 was paid, with six per cent interest. I agreed with the company's agent that Mr. Rees should make the appraisal. Warfield, Kendall and myself went with him. He appraised the corner lot at $7500 and the other at $2500—total, $10,000. The terms of payment were ten years' time—$1000 the first year, or upon the

delivery of the deed, whenever the deed was ready, and $1000 each year thereafter, until $10,000 had been paid, with six per cent interest."

Warfield testified: "There was an interview, at which a proposition was made for the Kirchoffs to make and deliver a quitclaim deed to the company, covering all the property embraced in the trust deed—the company to reconvey to the Kirchoffs their homestead. I believe the proposition embraced the lot cornering on the homestead—the conveyance to be made at an appraised value to be placed on the property by James H. Rees. The appraisement was made. The terms, as I now remember them, were, $1000 cash on delivery of the deed from the company, and $1000 a year until the property was paid for, together with interest at six per cent on deferred payments. Subsequently Mr. Kirchoff came with a carriage, and took Mr. Rees, Mr. Kendall and myself to look at the property, for the purpose of making the valuation. As near as I can remember, the price fixed was $7500 for the homestead and $2500 for the Pine street lot,—making $10,000." The witness also testified that the proposition came from the president, vice-president or chairman of the finance committee, while some one of them was in Chicago. He thought Mr. DeWitt, president of the company, made it. The witness also testified: "Personally, as agent of the company, I did not make the agreement heretofore testified to. What I did, was to submit to the Kirchoffs, propositions coming from the company."

Kendall testified that he commenced the foreclosure suit in July, 1878. There had been negotiations before that, in regard to a settlement. Kirchoff then made some arrangement, through Warfield, the financial agent of the company, to redeem his homestead. The witness further testified: "I understood it was agreed that Kirchoff could redeem or re-purchase from the company, at a price to be fixed by appraisers to be selected by the Kirchoffs and the company. These negotia-

tions were not conducted by me. I was only advised of them, as they were going on, by Mr. Warfield, and by conversations with Kirchoff. James H. Rees was agreed upon as the appraiser, and Mr. Warfield, Mr. Kirchoff and myself went with him one day and visited all the city property. My recollection is, that the price he placed on the homestead lots was $7000 for one and $2500 for the other. Kirchoff said he would undertake to pay that if the company would make him a title to it and release him from further liability on his note and trust deed. There was a general understanding that he could buy the property back on those terms, the whole amount to be divided into ten equal yearly payments, at six or four per cent interest,—I don't remember which."

We have not set out all that the three witnesses testified to, as their evidence is quite voluminous. We have, however, given the main features of their evidence relating to the making of the agreement relied upon. If these witnesses are not mistaken, it is apparent that Kirchoff, as agent for the complainant, made a contract with Warfield, the financial agent of the Union Mutual Life Insurance Company, that he and his wife should convey to the company, by quitclaim deed, all of the property embraced in their deed of trust, and that complainant was to redeem, or receive a reconveyance of the two lots known as the homestead property, for which she was to pay the company the amount at which the lots should be appraised by James H. Rees, payable, $1000 cash down, and $1000 annually, at six per cent interest. The contract, as detailed by Kirchoff, is plain and definite. It contains nothing uncertain or ambiguous. He says it was made in 1878, soon after the filing of the bill. We have no doubt, when all the evidence is considered, that he is correct on this point,—that is, the terms of the contract as to the property embraced in the deed of trust he had executed were then agreed upon and understood between him and Warfield, but the contract was not fully consummated until an agreement was reached with Mrs. Diversey

as to the property embraced in the deed of trust she had exe-
cuted. The object seems to have been to not close up any
contract with Kirchoff until a contract was made with Mrs.
Diversey. This seems apparent from the fact that Kirchoff
and wife executed and delivered their deed to the company on
the same day Mrs. Diversey delivered her deed. It may be
that all of the evidence of Kirchoff is not entirely consistent
and harmonious, but his evidence as to the terms and condi-
tions of the contract is not only harmonious, but is consistent
with what was done looking in the direction of a consumma-
tion of the contract. The lands were appraised, as agreed, by
the person named in the agreement. The Kirchoffs executed
and delivered their deed to the company, as provided in the
contract. The foreclosure proceedings were suffered to go on
without any objection from the Kirchoffs, no defense being
made by them. The company accepted the deed of the Kirch-
offs, under which they parted with all right of redemption in
and to the lands described therein, and it nowhere appears
that any consideration existed for that conveyance except the
agreement, relied upon here, to redeem the two lots upon pay-
ment of a stipulated sum. Why should the Kirchoffs part
with their right of redemption unless something was to be
received in return?

But it is said, Warfield's and Kendall's evidence, so far as
it tends to establish a contract, is contradicted by their letters
and acts after the alleged contract was claimed to have been
made. Kendall, the attorney, took no part in making the
contract, but, as he testified, understood, from the financial
agent of the company and from Kirchoff, that an agreement
had been made,—he knew what it was. Warfield testified,
that, personally, as agent, he did not make a contract, but
he says he had propositions from the company, which were
submitted and accepted. He gives the terms of the contract
substantially as given by Kirchoff. Now, if it be true that in
the letters and correspondence of the financial agent and attor-

ney with the company may be found statements not entirely in harmony with their evidence, such facts could not invalidate the contract after it was made, as disclosed by the evidence of Warfield and Kirchoff. Such facts may somewhat weaken their evidence, but that is all. As has been seen, Warfield was acting as financial agent of the company. He was entrusted with the management of the company's loans and securities and real estate in Chicago, and, when acting within the scope of the apparent power, the company will be bound by his acts. *Union Mutual Life Ins. Co.* v. *White*, 106 Ill. 67.

But aside from this, it is apparent, from the letters of the company, that Warfield had authority to make the contract relied upon. In January, 1879, Kendall wrote the company that he would have no difficulty in settling with Kirchoff, but that he dare not settle with him without settling the whole case. In reply to this, Sharp, the vice-president, wrote Kendall to confer with Warfield in regard to a settlement, saying that the company would undoubtedly be satisfied with any plan which should have their united indorsement. While this was after the alleged agreement was made, it shows the authority with which the agent was clothed. But, independent of this, the company could not accept and hold the deed executed by the Kirchoffs under the agreement made with the agent, and at the same time repudiate the agreement. The acceptance of the deed will be regarded as a ratification of the agreement made by the agent, under which it was executed *Toledo, Wabash and Western Railroad Co.* v. *Elliott*, 76 Ill. 67; Ewell's Evans on Agency, 65.

But it is said, no redemption can be allowed except of the whole premises, and upon the payment of the whole debt in money. Where a tract of land has been sold for a specified amount of money, in payment of a mortgage, and the mortgagor makes application to redeem, in the absence of a contract between the mortgagor and mortgagee to the contrary, the mortgagor would be required to redeem the entire tract

sold, and pay the whole of the mortgage indebtedness. (Jones on Mortgages, secs. 107-1072.) But this doctrine has no application whatever to a case where the mortgagor and mortgagee have entered into an agreement, under which a redemption may be made. The mortgagee may, by contract, extend the period allowed by law for redemption, and a court of equity will enforce such an agreement. (*Schoonhoven* v. *Pratt*, 25 Ill. 457; *Pensoneau* v. *Pulliam*, 47 id. 58.) And we perceive no reason why the mortgagee may not accept money or land in satisfaction of a part of the mortgage debt, and enter into a valid agreement to give the mortgagor an extension of time to pay a specified sum of money to redeem a part of the premises. No reason is perceived why an agreement to apportion the mortgage debt may not be made, and enforced as made. *Dexter* v. *Arnold*, 1 Sumn. 109; *Howard* v. *Gresham*, 27 Ga. 347; *Danforth* v. *Smith*, 23 Vt. 247; *Mutual Mill Ins. Co.* v. *Gordon*, 121 Ill. 366.

The quitclaim deed from the Kirchoffs to the company, dated September 4, 1879, contains the following clause: "This conveyance is given and accepted in satisfaction of certain indebtedness of the said Julius Kirchoff and Elizabeth Kirchoff, secured by a trust deed on said premises, given by the said Julius Kirchoff, and Elizabeth Kirchoff, his wife, and Angela Diversey, to Levi D. Boone, trustee, dated the 8th day of May, in the year 1871." And it is claimed that complainant is estopped by this clause in the deed from setting up the agreement to redeem. The consideration named in a deed has never been regarded as conclusive on the parties to the instrument. Parol evidence is not admissible to vary or contradict the terms of a deed or other written contract, yet such evidence may be introduced to show the true consideration of a deed, although it may be different from that named in the instrument. (*Booth* v. *Hynes*, 54 Ill. 363; *Primm* v. *Legg*, 67 id. 500.) The clause referred to is a mere recitation that the consideration for the deed was a certain thing, which could

not be conclusive, and if not conclusive it could not work an estoppel.

It is also claimed that complainant's failure to assert the alleged agreement in the foreclosure proceedings is a bar to its assertion here—that the proceedings in the foreclosure are conclusive. We are unable to concur in this position. It was a part of the arrangement under which the complainant was to obtain the two lots in controversy, that a decree of foreclosure should be entered, and that the premises should be sold under such decree. The decree was rendered and the sale made by consent, for the purpose of clearing the different tracts of land mentioned in the quitclaim deed, from certain incumbrances. The decree was not adverse to the interest of complainant, but in harmony with her interest. She is not attacking the decree, but claiming the enforcement of an agreement under which it was rendered, and in our judgment there is no ground for holding that the rights of complainant were cut off or in any manner impaired by the decree.

As has been said before, this record is quite voluminous, and there is much that has not been referred to, as a reference to everything contained in the record would extend this opinion to an unusual length. We have said nothing in reference to the argument that this is a bill for specific performance, and hence falling within the Statute of Frauds, as we have not regarded it as a bill of that character. The substance of the agreement was, that complainant was to have the two lots in question, notwithstanding her deed of September, 1879, and notwithstanding the decree of foreclosure, and sale thereunder, upon the payment of $1000, and the execution of her notes, secured by a mortgage on the premises, for the balance, payable $1000 each year, for nine years, with six per cent interest. The witnesses, in speaking of the agreement, some of them speak of it as one to redeem, while others speak of it as one to re-purchase. Kirchoff says it was to get the homestead back. Warfield said the Kirchoffs were to be allowed

to buy back their homestead.  Kendall, in his evidence, says they were to be allowed to redeem or re-purchase.  But this is immaterial.  The form of the transaction, in a court of equity, is not to be regarded.  The Kirchoffs conveyed away their right of redemption to a number of tracts of land, and in consideration they were to have the two lots free and clear from the deed of trust, upon payment of a certain sum of money. The deed conveying the right of redemption was accepted by the company, and has been retained by it, and equity demands that the company should comply with the contract, under which the deed was received.

It is claimed in the argument, the release of complainant and her husband from personal liability on the indebtedness, formed the consideration for the quitclaim deed they executed to the company.  A letter written by Kendall, September 18, 1877, to the company, would seem to be a complete answer to this position.  In that letter he informed the company that there was no personal liability existing against either,—that Kirchoff had been through bankruptcy, and hence was not personally liable for the debt; and that Mrs. Kirchoff, having signed the note prior to the act of 1874, relating to contracts of married women, was under the disability of coverture, and could not be held personally liable.  From this statement it appears that the company knew, long before the quitclaim deed was executed, that the Kirchoffs were not personally liable for the debt, and knowing that fact, it is not at all likely that a supposed release from a liability that had no existence formed a part of the consideration for the deed.

We think the judgment of the Appellate Court was right, and it will be affirmed.

*Judgment affirmed.*

Mr. Justice SCHOLFIELD: I do not concur in the foregoing opinion.