## GUSTAV A. DENTZEL *vs.* THE CITY AND SUBURBAN RAILWAY COMPANY AND BALTIMORE CONSOLIDATED RAILWAY COMPANY.

*Attorney and Client—Authority of Attorney to Accept Payment— Authority of One Attorney Employed by Another—Embezzlement by Attorney—Sale of Property by Agent for Less Than Authorized Amount—Chattel Mortgage.*

An attorney employed in anticipation of a suit has as much authority to bind his client in reference thereto before as after the institution of the suit.

When a claim is placed by the owner in the hands of one attorney for collection or settlement, and he places the same in the hands of another attorney with the consent of the owner, a payment made to the latter attorney in good faith is a valid discharge of the debt.

When an agent sells property which he is authorized to sell, but for a less sum than he was authorized to take, and embezzles the money, the owner cannot recover the property from the purchaser without refunding the amount paid.

When a chattel mortgage has been paid but not released, the mortgagee cannot maintain an action for the property.

Plaintiff, the owner of personal property who also held a chattel mortgage on it from a former owner, had a claim for the value thereof against the defendant in whose possession the property was. Plaintiff employed an attorney in Philadelphia with general authority to collect the claim or procure a settlement. This attorney employed an attorney in Baltimore with the knowledge and consent of the plaintiff and authorized him to collect the money claimed or to institute proceedings to recover the property. Without instituting a suit the Baltimore lawyer collected the amount claimed, and upon receipt thereof delivered to the defendant the original chattel mortgage, with a release thereof and a bill of sale of the property. The signature of the plaintiff to these instruments was forged, but the signature of the original mortgagor was genuine. The money so paid was embezzled by the Baltimore attorney, and plaintiff sued in replevin for the property. *Held,*

1st. That under these circumstances the defendant was authorized to make payment to the Baltimore attorney and such payment was a discharge of the debt.

2nd. That since the bill of sale and release of the chattel mortgage were not necessary to pass the title in the property to the defendant, the forgeries do not affect the transaction.

Appeal from the Baltimore City Court (PHELPS, J.) The trial Court rejected all the prayers of the plaintiff and instructed the jury that " there being nothing in the case to show that in the passing of the $3,000 check to Downs, under all the circumstances in evidence, the defendant's attorney failed to exercise such care and caution as might be reasonably expected of an ordinarily competent and careful attorney under like circumstances, the verdict must be for the defendants. "

The cause was argued before MCSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE and SCHMUCKER, JJ.

*Thos. Ireland Elliott* (with whom was *Frederick T. Dorton* on the brief), for the appellant.

The Court erred in making the question of negligence on the part of defendants' attorney, one of law and not of fact. Leaving out of view all other considerations it must be

clear that the question as to what care and caution might be reasonably expected of an ordinarily competent and careful attorney, under given circumstances, was one of fact and not of law.

What were the circumstances ? (*a.*) An agent was authorized to negotiate a sale. (*b.*) That agent was neither in possession of the property to be sold, nor could he, of himself, convey a good title thereto. (*c.*) He had none of the muniments of title. (*d.*) He was not an attorney of record, but was doing simply what any intelligent layman might have done. (*e.*) He forged papers, and on the faith of the genuineness of those papers had the money paid to his own order.

What is an ordinarily competent and careful attorney ? Surely the jury was alone the proper tribunal to pass upon these questions. The burden of proof was upon the defendants, and they attempted to show that they had been guilty of no negligence. There was no custom established among " ordinarily competent and careful" attorneys. The only testimony offered was as to what defendants' attorney would do under certain circumstances. And even he testified that he would not deal with all attorneys alike.

Can there be any doubt that it was the province of the jury to pass upon the question of the carefulness exercised by defendants' attorney in this case ? This Court, while recognizing the right of a Court, in some cases, to pass upon the question of negligence, goes on to say : "The case must be a very clear one to justify a Court in taking upon itself this responsibility ; it must present some prominent and decisive act in regard to the effect and character of which *no room is left for ordinary minds to differ.*" *Cumberland R. R. Co.* v. *Maugans,* 61 Md. 60 ; *Phila., Wilmington and Balto. R. R.* v. *Anderson,* 72 Md. 528 ; *State, use of Dyrenfurth* v. *B. & O. R. R. Co.,* 73 Md. 376.

The proximate cause of the loss of the money was not any negligence on the part of the plaintiff, but the forgery by Downs, who got the money from Penniman by deliver-

ing him two forged papers.   Penniman himself testified that the money would not have been paid, unless Downs had delivered to him the release of mortgage, which turns out to have been forged.   *Brown, Lancaster & Co.* v. *Howard Fire Ins. Co.*, 42 Md. 391; *Burrows* v. *Klunk*, 70 Md. 459; *Penna. Co.* v. *Franklin Fire Ins. Co.*, 181 Pa. 46; *Walsh* v. *Hunt*, 120 Cal. 52-3.

The question of forgery, *vel non*, was a most important element in the case.   A forged instrument passes no title.

The right to sell does not always include the right to pass title and collect the consideration.   It did not in this case, because the defendants' attorney knew that after the sale had been effected something yet remained to be done by the plaintiff himself.   *Mynn* v. *Joliffe*, 1 Moody & Robinsons, 327; *Kornemann* v. *Monaghan*, 24 Mich. 37; *Hirshfield* v. *Waldron*, 54 Mich. 651.

An agent authorized to sell at one price has no authority to sell for a different price or in a different manner.   *Holbrook* v. *McCarthy*, 61 Cal. 216; *Nat'l., &c., Co.* v. *Bruner*, 19 N. J. Eq. 331; *Pomeroy on Contracts*, 113, note 1; 114, note 1.

Moreover Downs *was a special agent,* and as such special agent had no right to exceed his authority.   As to the extent of that authority, appellees were put on their inquiry, and if he did unauthorized acts the appellees must alone suffer.   *Baltimore* v. *Reynolds*, 20 Md. 10; *Lister* v. *Allen*, 31 Md. 547; *Equitable Soc.* v. *Poe.*, 53 Md. 34; *Maddux* v. *Beavan*, 39 Md. 494; *Hamburger* v. *Paul*, 51 Md. 226; *Horsey* v. *Chew*, 65 Md. 560; *Fritchey* v. *Bosley*, 56 Md. 97; *Pepper* v. *Cairns*, 133 Pa. St. 114; *Sergeant* v. *Martin*, 133 Pa. St. 132.

*William S. Bryan, Jr.,* (with whom was *Geo. Dobbin Penniman* on the brief), for the appellee.

It is a well-settled principle that one, who by his conduct, puts it in the power of a scamp to deceive a reasonably prudent third party, must bear the loss which was only

rendered possible by reason of his conduct. *Young* v. *Grote*, 4 Bingh. 253; *Ingham* v. *Primrose*, 7 C. B. N. S. 82; *Tome* v. *Parkersburg R. Co.*, 39 Md. 36; *Andrews* v. *Clark*, 72 Md. 396.

It is difficult to see where there was any negligence or want of ordinary care on the part of Mr. Penniman in paying to Mr. Downs the money upon the delivery of the papers or in receiving the forged papers. The evidence is undisputed that Downs was the sole representative of Dentzel. Mr. Johnson, who admittedly had entire control of Dentzel's affairs, says that he "employed Downs to look after Dentzel's interest in Baltimore." He said that Downs "had made large collections for him," *Lister* v. *Allen*, 31 Md. 547; *Tubman* v. *Lowekamp*, 43 Md. 324; *Eversole* v. *Maull*, 50 Md. 95; *Pepper* v. *Cairns*, 133 Pa. St. 114.

It is to be born in mind that in reality none of the forged papers were necessary to pass the title to the carousel from the appellant to the appellee. It was personal property, and title to it would pass by mere delivery, express or symbolic. *Thompson* v. *B. & O.*, 28 Md. 396; *Van Brunt* v. *Pike*, 4 Gill 270. The property was actually in the possession of the appellee, and no actual delivery was therefore either necessary or possible. (*Lamotte* v. *Wisner*, 50 Md. 560.) Receiving the money and assenting to the appellee's maintaining possession by Downs, the agent of the appellant, was all that was requisite or necessary to make the title complete. The taking the bill of sale was an unnecessary formality. *Reeder* v. *Machen*, 57 Md. 63; *Lamotte* v. *Wisner*, 50 Md. 560. Again, this is an action of *replevin*. The plaintiff cannot recover unless he can show that he was entitled to the possession of the carousel at the time the writ was sued out. *McGuire* v. *Benoit*, 33 Md. 187.

BOYD, J., delivered the opinion of the Court.

The appellant, who was plaintiff below, leased a lot of ground and located a carousel at Lakeside Park, which belonged to the Lake Roland Elevated Railway Company.

He sold his lease, carousel and other property connected with it to Gideon Emory for eight thousand dollars, one-half cash and the other half secured by chattel mortgage, which became due on the first day of September, 1895. Before the deferred payment matured Emory became dissatisfied and the appellant verbally agreed to take the property back and release him. The carousel remained at Lakeside Park, which had become the property of the City and Suburban Railway Company, until the appellant brought this action of replevin. After that company became such owner, which was in the early part of 1895, the appellant, through Wm. F. Johnson, his attorney, who resided in Philadelphia, tried to sell the carousel to the company in order to get the claim against Emory settled—Emory having commenced the negotiations with the Lake Roland Company while it still owned the park. Parry Lee Downs, who was at that time practicing law in the City of Baltimore, was employed by Mr. Johnson, and after a considerable lapse of time he and Mr. Penniman, the attorney for the railroad company, finally agreed upon three thousand dollars as the price to be paid for the property and Mr. Penniman in payment of it gave Downs the check of the company, dated January 24, 1896. Downs gave Penniman what purported to be a bill of sale from Emory and Dentzel to the railway company for the carousel and other personal property, and also delivered to him the original mortgage from Emory to Dentzel, with what purported to be the release of Dentzel in the short statutory form. It subsequently developed that the name of Dentzel to both instruments had been forged, although the signature of Emory was genuine. Downs never accounted with the appellant, or M. Johnson, for the three thousand dollars, and this proceeding was instituted in September, 1898. At the trial the Court rejected the prayers offered by the plaintiff and granted one that instructed the jury to render a verdict for the defendant, which was done, and this appeal was taken from the judgment entered on that verdict

Downs' connection with the case seems to have commenced in May, 1895—on the 23rd of that month Johnson wrote to him asking him to get the mortgage from the clerk's office. A few weeks afterwards he wrote again for it and on June 15th acknowledged its receipt from Downs. Several letters from Johnson to Downs were offered in evidence, *all of which the plaintiff testified he had his authority to write.* One of them shows he had returned the mortgage to Downs, and in the one of December 11, 1895, after speaking of Emory's negotiations with the former company, he said they had agreed to let the company have the carousel for $3,000, if it gave its endorsed notes of $1,000 each, payable in June, July and August of that year, but the company had declined that. He then said that as there was such delay there was no reason why they should give up the additional one thousand dollars and concluded the letter as follows : " You will be kind enough to act upon this line ; that we want our $4,000 and we want it *now*, for after all this delay it is foolishness for us to defer the matter. If they don't settle take proceedings upon the mortgage and we will take back the property and hold Mr. Emory for the balance. I understand Mr. Emory to be very good. Please put some ' ginger ' in this and get a move on you." On December 17th, Johnson wrote to Downs that they were willing to release Emory if he would give them an order to remove the carousel, " or we will do the other thing, and that is to sell all our right, title and interest in the matter to the railroad company for the sum of $3.500, to be paid on or before the first day of February, 1896. Now, if this last proposition is accepted, we want negotiable paper for the thing at once. These are your instructions and kindly act accordingly." On January 10th, 1896, Johnson telegraphed Downs: " No answer to my letter proposing $3,250 ; anything to report. Drop a line." On the 14th of that month Downs was at Johnson's office (as he says he was frequently) and the latter wrote to the appellant telling him of that fact and added, "he says that they

have made a flat offer *to pay him $3,000* on or before the 1st day of February, in full, for the carousel and appointments, or that you may take the same away." On the next day the appellant wrote to Johnson: "In regard to the Baltimore matter I beg leave to say that I am willing to take the $3,000 cash, but do not want to pay the $250 attorney fees; under this condition I will take the same; get the money, as I need it badly; make an immediate settlement." A letter which appears in the record as of date January 14, *1895,* but was exidently *1896,* from Downs to Penniman, which was written on the business paper of Johnson, was sent as follows: "Called here to-day upon telegram of Mr. Johnson in reference to the Dentzel claim against the City and Suburban. Mr. D. will take $3,000.00 cash and not one cent less. If this is not satisfactory will remove the property on Saturday. Please give me your answer on Friday." Downs and Penniman met in a few days and had some controversy about the amount—the former claiming that the latter had agreed to give $3,000.00, while the latter said it was a less sum. They agreed to refer it to a mutual friend and he decided that Penniman had agreed to give the three thousand dollars and Penniman acted accordingly and directed his company to issue its check for that amount, which was done. What we have quoted, together with other evidence in the record, shows conclusively that Johnson, who was the general attorney of the appellant, had employed Downs to act, that his letters to him were written with the authority of the appellant, and that Downs was authorized to collect the money, or, on failure to do that, to institute proceedings to recover the property.

Under these circumstances it seems to us that the railway company was fully authorized not only to deal with Downs, but to pay him the money. It is true that he was not an attorney of record for the appellant at any time pending the proceedings, as no suit had then been brought. But "the relation of attorney and client commences from the date of the employment of the attorney, that *is,* from the

time when the agreement or contract by which the attorney is retained is consummated." 3 *Ency. of Law* (2nd ed.), 316. His authority does not commence with the institution of the suit, but when employed in anticipation of a suit he has as much power to bind his client before as after the suit. *Hefferman* v. *Burt*, 7 Ia. 320. Of course that is only so when he has been actually employed for the purposes of that suit. We held in *Northern Central Railway Company* v. *Rider*, 45 Md. 24, and *Harrison* v. *Morton*, 87 Md. 671, that although service of process issued to bring the defendant into Court on an attorney is not sufficient, yet the attorney can waive the service of such process and enter his appearance, and the presumption is that he had authority to do so. If he could not bind his client until he became attorney of record, a claim sent to an attorney for collection could not legally be paid to him unless he first entered suit. Such a doctrine would not only be in opposition to the universal practice in such matters, but would oftentimes subject debtors, as well as clients, to unnecessary costs. The argument of the counsel for the appellant proceeds on the theory that Downs was a mere agent to sell the property of his principal, but the testimony shows that this claim, represented by the mortgage, was placed in the hands of Mr. Johnson for collection or settlement, and he in turn placed it in the hands of Downs with the consent of the appellant. He was either to recover the property or collect the money, and if the money had been paid to Johnson there could be no possible question about its being a good payment, and when the fact is established, as it clearly is, that Johnson thus employed Downs to act in the matter, an innocent party dealing with him is as well protected as if he had dealt directly with the original attorney. If that were not so, merchants and others who pay their debts to attorneys employed by commercial agencies, or by the attorneys who first receive the claims for collection, would not be protected.

Whether or not Johnson could be held responsible for

the acts of Downs we are not called upon to determine, for that is not before us and would depend upon circumstances. The general rule is that when an attorney is employed to collect a claim and he places it in the hands of another attorney, through whose negligence or misconduct the claim is lost, he is liable therefor to the principal *in the absence of an agreement or assent that such other attorney should be employed.* Stephen v. *Badcock,* 3 B. &. Ad. 354 ; *Pollard* v. *Rowland,* 3 Blackf. 22 ; *Hoover* v. *Wise,* 91 U. S. 308 ; *Lewis* v. *Peck,* 10 Ala. 142 ; *Bradstreet* v. *Everson,* 72 Pa. St. 124 ; *Milligan* v. *Fertilizer Company,* 89 Ala. 322. But however that may be, there can be no doubt that when a party employs an attorney to enforce a claim or procure a settlement and knows that he will employ another attorney to conduct the transaction with the other party, and especially when he knew, as was this case, that he had actually employed another attorney, he cannot be heard to question the right of the third party to make the settlement with him—provided, of course, it is within the scope of the employment of the original attorney. The debtor must take the risk as to whether the attorney to whom he makes the payment was employed, but when that fact is established he is protected, provided the receipt of the money is within the scope of his employment.

But it is said that Downs was only authorized to sell the property and collect the money, provided the company paid him $3,250. In the first place it would be difficult to find in the record sufficient evidence of that fact to justify its being submitted to the jury. As we have seen, Mr. Johnson's letter of December 11, 1895, shows that they had agreed to take three thousand dollars, payable in three instalments, which was declined, and the appellant afterwards wrote that he was willing to take the three thousand dollars " but do not want to pay the $250 attorney fees ; under this condition I will take the same," and then immediately added " *get the money, as I need it badly; make an immediate settlement.*" He did not in terms decline to ac-

cept from the company the three thousand dollars, but " did not want to pay the $250 attorney fees." The objection was to the fee rather than to the amount of the purchase-money, and Mr. Johnson, after quoting that letter, testified, " then I telegraphed ; it is my telegram that Mr. Downs speaks of in the letter to Mr. Penniman." In that letter Downs wrote to Penniman that " Mr. D. will take three thousand dollars cash and not one cent less. At least that is the only letter in the record from Downs to Penniman, and it referred to a telegram ·from Mr. Johnson— although it is dated " January 14th." Downs testified that as far as he could recollect he was authorized to sell it for three thousand dollars. It might have been that Downs was willing to take the chances about getting his fee of $250, and if he had accounted for the three thousand dollars it may be that the appellant or Mr. Johnson could have questioned his right to the fee, but certain it is, by the admission of Mr. Johnson, that Downs was authorized to settle for three thousand dollars, independent of Down's fee. There would seem, therefore, but little room to question the settlement on the ground that Downs accepted less than he was authorized to take. But if that be conceded, after it is established, as we think it is, that Downs was authorized to sell the property and receive the purchase-money, and it was paid, can it be said that the appellant can demand the property without at least refunding the money that was paid ? Should any Court of justice permit a principal to recover property which his agent was authorized to sell, and did sell, merely because he sold for less than he had authorized him to take, although that fact was not known to the purchaser, without his refunding or offering to refund the amount that was paid ? Most assuredly not. Payment to the agent is payment to the principal, and whether the latter received it or not from the agent is immaterial, if the agent was authorized to sell and receive the purchase money.

Then again great stress is laid on the fact that the bill of sale and the release of the mortgage were forgeries. Under

our view of the case it is not necessary to enter into a dis-
cussion of the cases which refer to agents selling property,
such as bonds, stocks, etc., by means of forgeries of the
principals' signatures.    There was no necessity for a bill of
sale to transfer the property, as it was in the possession of
the company.    It was not the bill of sale that transferred
the title, but the verbal sale and the receipt of the purchase-
money.    Nor was there any necessity, so far as passing the
title of Dentzel was concerned, to have the mortgage re-
leased.    That was a very proper precaution on the part of
Mr. Penniman, as the mortgage, if properly executed and
recorded, would be a cloud on the title.    But suppose no
suggestion had been made, either by Downs or Penniman,
as to the bill of sale or release of the mortgage, and Downs
had paid the money to the appellant, or Mr. Johnson, would
the fact that neither was executed have in any way pre-
vented the title of the appellant from passing to the com-
pany ?    If Emory, the mortgagor, had given his consent to
the sale, and the appellant had sold it and received the pur-
chase-money, who could disturb the company's possession
of it ?    In point of fact Emory did unite in the bill of sale
and thereby showed his consent—and for the sum of $3,000,
as that is the consideration named in it—and he was really
the only one that there was any special advantage in having
a party to such an instrument, so as to show his consent,
for the payment to the appellant was sufficient so far as he
was concerned.    The fact that the forgeries were committed
was not known to Penniman, and he had no reason to sus-
pect that they were such.    He knew that Downs was in
communication with Johnson, and at the time Downs was a
member of the bar in good standing, and Penniman had no
reason to question his integrity.    The forgeries cannot,
therefore, in any way affect the transaction.

The fact that the release of the mortgage was a forgery,
and therefore the mortgage is still unreleased, does not au-
thorize a proceeding by replevin.    That is a possessory
action and even if the legal title be in the plaintiff he cannot

recover without the right of possession. As he has been paid for his interest in the mortgage he does not have the right of possession. It was held as early as *Paxon's Lessee* v. *Paul*, 3 H. & McH. 399, that a mortgagee could not maintain an action of ejectment after the mortgage was paid, although no release had been executed. That principle has since been recognized in *Beall* v. *Harwood*, 2 H. & J. 167; *Berry* v. *Derwart*, 55 Md. 73, and *Richardson* v. *Railroad Co.*, 89 Md. 126, and equally applies to actions of replevin.

We have not been unmindful of the fact that the payment was for less than the whole amount called for in the mortgage, but there was nothing due from the company to Dentzel, the debt was due by Emory, and therefore no such question is involved as sometimes arises when less than the whole amount due is accepted by an attorney. Emory may have been liable for the amount of the mortgage debt under sec. 46 of Art. 21 of the Code, which provides that "a mortgage of personal property shall be deemed to contain an implied covenant, (unless the contrary is therein expressed) by the mortgagor, to pay the debt and interest specified in said mortgage." We are not informed as to the terms of the agreement between him and the appellant, which Mr. Johnson referred to in his testimony, but the railway company did not assume the mortgage and was only liable for the amount it agreed to pay for the property, which it did pay.

As the substance of the prayer granted by the Court was correct, we need not dwell on its form, although we do not see that the appellant can object to the reason assigned in it for granting it. Downs having been authorized to sell the property and receive the purchase-money, it was proper to instruct the jury to find for the defendant. If there had been any legally sufficient evidence to show that Mr. Penniman had not exercised proper care and caution in his dealings with Downs, another question might have arisen, but as there was no such evidence the Court, under the es-

tablished facts, was justified in giving the instruction.   Being of that opinion it is not necessary to refer to the prayers offered by the plaintiff and the judgment will be affirmed.

> *Judgment affirmed, appellant to pay
> the costs.*

(Decided January 10th, 1900).