# CASES

# FIRST DISTRICT

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1925.

---

## Traders Safety Building Corporation et al., Appellees, v. Joseph H. Shirk et al., Appellants.

## Gen. No. 29,267.

1. PENALTIES AND FORFEITURES—*policy of courts towards forfeitures*. Courts both of law and equity abhor forfeitures, and covenants against assignments will be strictly construed to prevent them.

2. LANDLORD AND TENANT—*right to terminate lease upon breach of covenant against unauthorized assignment*. The unauthorized assignment of a lease in breach of its covenants gives the landlord the right to terminate it.

3. LANDLORD AND TENANT—*equitable relief against forfeiture of lease for unauthorized assignment in breach of covenant*. Equity will not interpose to grant relief where a landlord exercises his option to declare a forfeiture of the lease for an unauthorized assignment thereof in breach of its covenants.

4. LANDLORD AND TENANT—*covenant requiring notice of assignment of lease to "a person or persons" as including assignment to corporation*. Compliance with the covenant of a lease for the giving of notice to the lessor in the event of an assignment to "a person or persons" held not excused by reason of the fact that the assignment was to a corporation.

5. LANDLORD AND TENANT—*right of landlord to assign with lease accrued cause of action for forfeiture for unauthorized assignment by lessee*. At common law the landlord to whom has accrued a right to declare a forfeiture of the lease because of an unauthorized

assignment thereof was without power to assign such right to the transferee of the lease.

6. LANDLORD AND TENANT—*sufficiency of evidence to show knowledge by trustee lessor of assignment of lessee's interest prior to acceptance of rent from assignee.* Evidence in a suit to restrain the prosecution of a suit in ejectment and to set aside an alleged forfeiture of the lease declared on the ground of an unauthorized assignment by the lessee, held sufficient to show that the trustee lessor had actual knowledge of the alleged unauthorized assignment prior to its acceptance of rent for the demised premises.

7. AGENCY—*retention of rents paid through agent as ratification of agent's unauthorized acceptance of rent.* Where the agent of the lessors for the collection of rents accepted rent from an alleged unauthorized assignee of the lessee's interest, the lessors, by retaining the rents so collected, ratified the act of their agent, if unauthorized.

8. LANDLORD AND TENANT—*sufficiency of evidence to show knowledge by beneficiaries of lease of assignment of lessee's interest prior to acceptance of rent from assignee.* Evidence in a suit to restrain prosecution of an action of ejectment and to set aside an alleged forfeiture of the lease declared because of an alleged unauthorized assignment of the lessee's interest to a corporation, held sufficient to show that the beneficiaries of the lessor interest in the lease had actual knowledge of the alleged unauthorized assignment prior to their acceptance of the rents collected through their trustee.

9. LANDLORD AND TENANT—*sufficiency of evidence to show knowledge by attorney in fact of beneficiaries under lease, of assignment of lessee's interest prior to acceptance of rent from assignee.* Evidence in a suit to restrain prosecution of an action of ejectment and to set aside an alleged forfeiture of the lease declared because of an alleged unauthorized assignment of the lessee's interest to a corporation, held sufficient to show that the attorney in fact of the beneficiaries of the lessor interest in the lease had actual knowledge of the alleged unauthorized assignment prior to the acceptance of rent from the assignee.

10. AGENCY—*imputation to principal of knowledge acquired by agent in course of employment.* Notice to an agent or attorney received in the course of the agent's employment, or under circumstances such as to induce belief that it was received while transacting such business, is as effectual as notice to the principal personally.

11. ATTORNEYS AND COUNSELORS—*sufficiency of evidence to show duty of attorney in fact for lessors to communicate to clients information that lessee had assigned interest in lease to corporation and not person.* Evidence in a suit to restrain prosecution of an action of ejectment and to set aside an alleged forfeiture of a

lease declared because of an alleged unauthorized assignment of the lessee's interest to a corporation, held to show knowledge of the attorney in fact for the lessors that the assignment as to a corporation and not to a person, acquired under circumstances such as to give rise to a duty to communicate the same to his clients.

12. LANDLORD AND TENANT—*sufficiency of evidence to show waiver by lessors of right to declare forfeiture of lease because of alleged unauthorized assignment by lessee.* Evidence in a suit to restrain prosecution of an action of ejectment and to set aside an alleged forfeiture of a lease declared because of an alleged unauthorized assignment by the lessee to a corporation, held to show waiver of right to declare a forfeiture by a recognition of the assignee as lawful tenant of the leasehold estate.

Appeal by defendants from the Circuit Court of Cook county; the Hon. HUGO M. FRIEND, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1924. Affirmed. Opinion filed April 13, 1925. Rehearing denied April 27, 1925. *Certiorari* denied by Supreme Court (making opinion final).

HOAG & ULLMANN, for appellants.

EDGAR C. BLUM, CHARLES L. BARTLETT, SHERMAN C. SPITZER and NORBERT B. TYRRELL, for appellees.

MR. JUSTICE MATCHETT delivered the opinion of the court.

This is an appeal by defendants from a decree which restrained the prosecution of an ejectment suit brought for the purpose of securing title and possession to a leasehold situated in the business district of Chicago.

The bill also prayed that an alleged forfeiture of the leasehold interest of Traders Safety Building Corporation might be set aside, and the title of complainant corporation to the same might be confirmed. The decree granted this relief, as prayed.

The cause was heard on exceptions to a master's report and the decree entered conforms with the findings of the report.

The defendant lessors are themselves lessees under

two underlying leases. Each of these prior leases covers a parcel of land running east and west and the two strips or parcels are parallel and adjacent to each other. The sublease here in question covers the west half of these two strips, and is known as the Traders Building. The east half has an improvement known as the Imperial Building. The underlying leases were executed in 1881.

The original lessor under the subleases was Frederick S. Eames. The original lessee under the sublease here in question was a corporation, the Traders Safe and Trust Company.

Upon the death of Eames, testate, his widow took his estate. She thereafter transferred to Elbert W. Shirk, the immediate predecessor in interest of these defendants. The sublease passed through mesne assignments to the complainants Max L. Teich and Carl C. Roessler.

Elbert W. Shirk died on September 15, 1918, testate. He devised his property to his nephews and nieces Joseph H. Shirk, Elbert Walker Shirk, Richard E. Edwards, Milton A. Edwards, Florence E. Campbell, Clara E. Crume and Mary A. Edwards. The defendant, First Trust and Savings Bank of Chicago, was named as executor of his estate and held the title until March 29, 1921. On that date the executor distributed the estate and disposed of the testate's interest by the execution of a written assignment to the beneficiaries under the will.

One of the legatees, a nephew, Elbert Walker Shirk, died intestate on September 6, 1919. The First Trust and Savings Bank above named was appointed the administrator of his estate. Therefore, at the time of the transaction out of which this controversy arises, the legal title to the leasehold estate was in the First Trust and Savings Bank as executor of the will of Elbert W. Shirk.

The building upon the leasehold was erected by the

Traders Safe and Trust Company in 1884. The evidence indicates that it is a good and substantial office building of brick and stone, 90 feet front by 60 feet deep, 7 stories high with basement; and that, at the time it was constructed, it cost more than $200,000. It was erected in a manner which complied with the ordinances of the City of Chicago and with the terms and provisions of the lease.

The assignment which, it is claimed, justified the forfeiture of the leasehold estate is in writing and dated March 1, 1921. Thereby Max L. Teich and Carl C. Roessler and their wives conveyed, transferred and assigned their leasehold estate and all right, title and interest therein to the complainant, the Traders Safety Building Corporation.

The sublease from Elbert W. Shirk provided that neither the lessees nor their successors or assigns could assign without first notifying the lessor, his heirs, etc., in writing of the consideration and terms offered "by any and all such person or persons" for such an assignment or transfer and of the name, place of residence and address of such person or persons; and that the lessor, etc., should first have the option, right and privilege to purchase the interest of the lessees at the same price and upon the same terms as those offered by such person or persons, provided he or they should, within 15 days from the receipt of the notice, notify the lessee in writing of their intention to purchase the same.

It was further covenanted that any assignment made by the lessee without first complying with these conditions should be absolutely null and void.

Prior to the execution and delivery of the assignment, Teich and Roessler on January 4, 1921, entered into a written contract with Louis M. Kardos for the sale and conveyance of this leasehold estate to him "or his nominee," for the purchase price of $180,500, $15,000 of which was to be paid in cash as earnest

money and $65,500 within 10 days after the title had been accepted, the balance of $100,000 to be paid by the execution and delivery of promissory notes to be secured by a mortgage or trust deed of the purchaser or his nominee.

Thereupon, Teich and Roessler caused a notice in writing to be prepared. It recited that it was given pursuant to the terms and provisions of the lease and that Louis M. Kardos had offered to purchase for the price of $180,500.

The notice further recited in detail the provisions of the contract between Teich and Roessler and the provisions of the lease as to assignments, and concluded:

"You are further notified that this notice is given to you in accordance with the above mentioned provisions in said lease contained, and that unless you shall within 15 days from the date of the receipt of this notice by you so notify the undersigned in writing of your election to purchase the interests of the undersigned in said leasehold that all of your rights thereafter to do so, or to object to any such assignment or sale by the undersigned to the said Louis M. Kardos, at the above-mentioned price and terms, will be terminated, and the undersigned will proceed to complete said assignment and sale of all the right, title and interest of the undersigned in and to the leasehold estate created by the said indenture of lease and in and to the premises thereby demised. You are further notified that the place of residence of the said Louis M. Kardos is 640 Berry Avenue, Chicago, Illinois, and that his business address is 305 South LaSalle Street, Chicago, Illinois."

The notice did not specifically mention the Traders Safety Building Corporation. It did, however, state that the mortgage to be executed as security for the unpaid purchase money might be given by Kardos "or his nominee."

This notice was personally served upon the First

Trust and Savings Bank as executor under the will of Elbert W. Shirk and as administrator of the estate of Elbert Walker Shirk, on February 2, 1921, and afterwards upon the other defendants at their several places of residence in Indiana, Minnesota, New Jersey, California and Florida, the last service being made on defendant, Clara E. Crume, at New Smyrna, Florida, on February 11, 1921. The notice was also recorded in the recorder's office of Cook county.

Neither the defendants nor any of them within 15 days after the service of this notice or at any time thereafter in any way exercised or attempted to exercise the option.

One of the defendants, Joseph H. Shirk, at this time lived at Peru, Indiana, and was president of a trust company there. He had been engaged in the banking business for 21 years. Peru is 125 miles from Chicago and can be reached in a trip of four hours by railroad, and Mr. Shirk was accustomed to come to Chicago every fortnight for 15 years past.

Mr. Shirk was served with this notice on February 3, 1921, and on the same day wrote his attorneys, Hoag and Ullmann in Chicago (the extent of whose authority in so far as these defendants are concerned will be later discussed) as follows:

"Mr. E. A. Teich has just served written notice on several of us here of their intention to sell the Traders Building lease. This fifteen-day notice he claims is necessary under their lease from the Imperial Building. The consideration of their sale is $180,000, and I take it that, since we have not heard from you, it is your opinion that it will not pay us to consider trying in any way to exercise our option for purchase in the matter, and we certainly would not care to do so unless the price is so reasonable that we could turn it to advantage in the immediate future."

February 3, 1921, the First Trust and Savings Bank wrote Hoag and Ullmann, who represented it (at the

request of the defendant⁻) in the probating of the Shirk estates, as follows:

"Enclosed I hand you copy of a notice which was served on us yesterday regarding the lease from the Traders Safe and Trust Company. Please look this over and advise us what action, if any, is necessary in the matter, and oblige."

A charter was issued to the complainant, Traders Safety Building Corporation, by the Secretary of the State of Illinois on February 24, 1921, and this charter was also recorded on March 1, 1921. The articles stated that it was incorporated for the purpose of acquiring, owning, leasing and operating the building and site thereof which are here in controversy. Its 1,000 shares of stock (with the exception of three shares) were owned by Louis M. Kardos.

March 2, 1921, the proposed sale was completed. The Traders Safety Building Corporation paid to Teich and Roessler $65,500 in addition to the $15,000 theretofore paid, and delivered its five promissory notes for the aggregate sum of $100,000, together with a trust deed conveying the leasehold estate to the Chicago Title and Trust Company, as trustee, to secure the payment of these notes. At the same time it received from Teich and Roessler an assignment of the leasehold dated March 1, 1921, which was recorded in the recorder's office of Cook county.

At the same time the insurance policies on the demised premises and the leases to tenants in possession were also assigned and delivered, the actual tenants were notified that the sale had been consummated and that they must thereafter attorn to the complainant. The Traders Safety Building Corporation also at once assumed the exclusive control and management of the premises, which it has ever since continued to exercise, collecting rents, paying for repairs, insurance, interest, taxes, and other charges.

Since it was personal property (at the time of this

transfer as above set forth and until March 29, 1922), the defendant First Trust and Savings Bank was the legal owner of the leasehold, and thereafter it was the agent of defendants, specifically authorized to receive, collect and distribute the rents. The Traders Safety Building Corporation thereafter made valuable improvements on the premises, employing architects and contractors, at a cost of approximately $25,000, by which the market value of the premises was increased more than $25,000 and the rental thereof more than $2,000 per annum.

Immediately after the transfer and assignment of the leasehold estate the Traders Safety Building Corporation, on March 2, 1921, paid to the First Trust & Savings Bank the quarterly instalment of rent then due under the lease, amounting to $3,250; and on June 1, 1921, September 1, 1921, and December 1, 1921, similar quarterly instalments of rent then due were paid to the bank by means of the checks of the complainant, Traders Safety Building Corporation. These checks were signed by it and made payable to the order of the First Trust and Savings Bank. The bank received and accepted the checks, collected the same and disbursed the proceeds thereof to the defendants. These proceeds the defendants have ever since retained and have not offered to return.

On December 15, 1921, one A. Sitron bought from Mr. Kardos his stock in the Traders Safety Building Corporation for the total sum of $225,000.

The first intimation that defendants claimed that the assignment was in violation of the terms of the lease was made by their attorney, Mr. Hoag, on December 29, 1921, in a conversation with Mr. Charles Olsen at the office of the Chicago Title and Trust Company. On that day Hoag asked for the opportunity of looking at the files relative to the assignment of the leasehold, which was granted, and he examined the papers with relation to the notices given, and said he was satisfied

the proper notice had not been given, and Mr. Olsen made a notation on the opinion to that effect.

March 1, 1922, complainant again tendered to the First Trust and Savings Bank its check for the rent, which the bank declined to accept, stating that it did so upon the order and direction of Parker H. Hoag, to whom the complainant corporation was referred in the matter.

The testimony of Richard E. Edwards is to the effect that he first heard that the assignment had been made to the Traders Safety Building Corporation, about the middle of January, 1922 and first heard of this corporation about that time when Mr. Louis Manierre told him about the transfer of the stock of the corporation. He says that a day or two after, he, Edwards, told Joseph H. Shirk at Peru, Indiana, what he had heard about the matter, and on January 25, 1922, Mr. Joseph H. Shirk and Mr. Edwards came to Chicago to see Mr. Hoag about it, and after consulting told him to take any legal steps that were necessary according to his judgment.

Thereafter, on February 20, 1922, Messrs. Hoag and Ullmann notified the First Trust and Savings Bank "as fiscal agent of Joseph H. Shirk and others" that, if the Traders Safe Deposit Company tendered the rent payable on March 1, 1922, it should refuse to accept payment; and that, if inquiry was made as to the reason for refusing it, the bank might say that it was doing so at the direction of Joseph H. Shirk and others.

About March 1, 1922, the attorneys for Traders Safety Building Corporation had a conversation with Mr. Hoag and asked why he had refused to receive the rent, and Mr. Hoag said: "We were served with notice that the assignment was going to be made to an individual. We did not get any notice that it was going to be made to a corporation, and unless there is an adjustment made in the matter, we might claim

there was ground of forfeiture." The attorney for Sitron said: "But you did take the money, didn't you, for four quarters?" to which Mr. Hoag replied, "We did not learn until a few days ago that the assignment had been made to a corporation."

April 13, 1922, defendants, by Hoag and Ullmann as their agents and attorneys in fact, served a written demand upon the Traders Safety Building Corporation for the immediate possession of the premises, and on the same day and in like manner a written notice was served on Max L. Teich and Carl C. Roessler, declaring the term of the lease ended and determined, and demanding immediate possession of the premises. On the next day, April 14, defendants began the ejectment suit against Max L. Teich, Carl C. Roessler and Traders Safety Building Corporation as defendants. Pending the suit, the Traders Safety Building Corporation tendered the rent upon the days upon which it would come due by the terms of the lease, but all these tenders were refused.

The briefs in this case are voluminous, and it will be impossible to mention (much less discuss) the 400 or more authorities cited.

That courts both of law and equity abhor forfeitures and that covenants against assignments are not favored and will be strictly construed in order to prevent forfeitures, are propositions which may well be considered elementary. *Chadwick v. Parker,* 44 Ill. 326; *Palmer v. Ford,* 70 Ill. 369; *Postal Tel.-Cable Co. v. Western Union Tel. Co.,* 155 Ill. 335. That the unauthorized assignment of lease in breach of its covenants gives a landlord the right to terminate it and that equity will not grant relief against such forfeiture is also settled. *Kew v. Trainor,* 150 Ill. 150; Pomeroy on Equity Jurisprudence, 4th ed., vol. 1, p. 861, secs. 453, 454; and *Barrow v. Isaacs,* [1891] 1 Q. B. 417.

The complainants suggest that, since the assignment

was made to a corporation, no notice was necessary because the lease provides for notice only in case of assignment to "a person or persons," and it is urged that a corporation is not a person within this meaning.

The report of the master and the decree of the court express doubt as to whether any notice was in fact necessary. Defendants cite *Betts v. Menard*, Breese (1 Ill.) 395, and *Blair v. Worley*, 1 Scam. (2 Ill.) 178, to this point. We do not think, even under a strict construction in their favor, this contention can be sustained.

The point requires the determination, if possible, of the intention of the parties to the lease. That intention must be gathered not only from the particular word or words used, but from the whole instrument. There is nothing to indicate that the words "person" or "persons" were used in any different sense in the clauses which provide for the manner of notice than in other parts of the lease. If we may regard the words as ambiguous, there are no circumstances from which we can gather the limitation for which complainants contend. There were such facts in the cases cited and in *Coddington v. Havens' Ex'rs*, 8 N. J. Eq. 590, on which complainants also rely. Moreover, we have found *Willmott v. London Road Car Co., Ltd.*, [1910] 2 Chancery 525, persuasive, if not conclusive, against complainants' contention. See also the note to the above case in 20 Annotated Cases, p. 733.

It is further suggested by complainants that, as the legal title to the leasehold estate was in the First Trust and Savings Bank at the time of the assignment, the right, if any, to forfeit the leasehold was in the bank as executor and was not assignable. Therefore (it is urged) defendants were without power to forfeit the lease. There is no evidence that the bank, during the time it held the title, elected to forfeit. Assuming that it did have such right, it was not specif-

ically mentioned in the writing by which the bank as executor transferred the legal title to the defendants.

There is, we think, no doubt that such a cause of action was not assignable at common law. *Trask v. Wheeler,* 7 Allen (Mass.) 109; *Watson v. Smith,* 180 Ill. App. 289. The common law rule was, however, changed by the Statute of 32nd Henry the Eighth, ch. 34, and this statute has been adopted as a part of the common law by the Legislature of Illinois. It has never been repealed, and we do not understand defendants' claim that under the provisions of that statute, this right of action would be assignable. The contention is, however, made that section 14 of the Landlord and Tenant Act (Smith-Hurd Ill. Rev. St. 1923, p. 1265 [Cahill's St. ch. 80, ¶ 14]) as the later enactment has changed the rule. This section 14, however, does not expressly give to an assignee the right to sue for a past violation of a covenant, and the prior English decisions construing the statute of Henry VIII, *supra,* clearly held that statute did not authorize an assignment of this kind. *Lewes v. Ridge,* 2 Cro. Eliz. 863; *Flight v. Bentley,* 7 Sim. 149; *Grescot v. Green,* 1 Salk 199; *Canham v. Rust,* 8 Taunton's Rep. 230.

Section 14 has been held to obviate the necessity of attornment in *Barnes v. Northern Trust Co.,* 169 Ill. 112, thus changing the rule as theretofore announced in *Fisher v. Deering,* 60 Ill. 114. In *Purvis v. Shuman,* 273 Ill. 286, it is intimated that sections 14 and 15 of the Landlord and Tenant Act [Cahill's St. ch. 80, ¶¶ 14, 15] are substantially the same as the first and second sections of the statute of Henry VIII, and it is specifically stated that section 15 must receive the same interpretation as the corresponding section in the English statute.

It would seem that, where a right of action is entire and arises prior to the assignment, only the assignor could maintain the suit, while if the breach

out of which the cause of action arises is a continuing one, it would, of course, pass to the assignee. However, whether a court of equity, which looks to the substance rather than the form, might not regard the right here in question as already vested in the beneficiaries (as defendants suggest) is a question not free from doubt, and we prefer to put our decision upon other grounds.

Whether defendants had knowledge that the assignment in question had in fact been made to the corporation, and with such knowledge waived it, is the controlling question in this case. (This is assuming, of course, that the notice given was insufficient and that an assignment without notice gave the defendants the right, if they should so elect, to forfeit the lease.)

We have come to the conclusion that whether we regard the matter from the standpoint of the First Trust and Savings Bank (which was the holder of the legal title at the date of the assignment), or from that of the defendants, the beneficiaries and actual parties in interest, it must be held that the right, if any, to forfeit the lease was waived with knowledge.

In the first place, it is admitted that all of the defendants had such knowledge by the middle of January, 1922. The rent tendered by the complainant corporation was refused on the first day of March thereafter. Notice of the election to forfeit was given on April 13, 1922. It is conceded that the receipt of rent from the corporation with knowledge was inconsistent with the position that the assignment was void, and that defendants themselves so regarded it is indicated by the fact that they refused to receive from the corporation further payment of rents.

Neither the bank nor the defendants, however, offered to return the rents which had already been received, and we think, under the circumstances, the retention of this rent with knowledge was not less inconsistent with the forfeiture of the lease than the

acceptance of further payments of rent would have been.

The defendants, however, not only retain these payments, but argue that they have the legal right so to do. *Hepp Wall Paper & Mercantile Co. v. Deahl,* 53 Colo. 274, 125 Pac. 491; and *Peebles & Co. v. Sherman,* 148 Minn. 282, 181 N. W. 715, are cited to that effect. Those cases are, however, clearly distinguishable. The rent which was there held to be recoverable after forfeiture of the lease was paid by the lessees, who, at all events, owed it. Here the corporation was not and could not be obligated on the lease unless the assignment to it was valid. There is not a scintilla of evidence that after the assignment was made the rent was paid in the names of Teich and Roessler, nor in their behalf. The checks were drawn by the corporation. Receipts were given to the corporation and in its name. The master found and the decree finds that these payments were received by the bank with knowledge and we think an even stronger finding to the effect that explanation was made to the bank at the time of the first payment would have been justified.

There is no evidence that these payments of rent were voluntary in the sense of payments made by one not having an interest. On the contrary, the payment was made and accepted by the bank on the theory that the payer was the assignee of the lease, the owner of the leasehold, and the tenant of defendants. Defendants now deny that this is so. They in effect say: If we had known you claimed to be the assignee of the lease, we would not have accepted this rent because, by so doing, we would have recognized you as our tenant. Our ignorance, however, will work to our advantage. Now that we have full knowledge, we will keep the rent you have paid, forfeit the lease, appropriate the building and throw you out.

The defendants, however, further say that, after the assignment of the bank to them as beneficiaries, the

bank was only their agent for the collection of the rent; and that it was therefore without authority to waive the supposed forfeiture. If we accept that theory, the position of defendants is, we think, not bettered. The bank, it is conceded, was authorized to collect the rent. It was not, therefore, wholly without power to represent the beneficiaries, and, at the most, it can only be said that it exceeded the power granted to it in accepting rent from the complainant corporation. If so, slight acts on defendants' part would amount to a ratification of the action of their agent, which would be readily implied. *Harrod v. McDaniels,* 126 Mass. 413. Defendants could not retain the rents collected without ratifying the action of their agent in accepting the rents. There is a wealth of authority to this effect. *Henderson v. Cummings,* 44 Ill. 325; *Swisher v. Palmer,* 106 Ill. App. 432; *Union Mut. Life Ins. Co. v. Kirchoff,* 133 Ill. 368; *Dentzel v. City & Suburban Ry. Co.,* 90 Md. 444. We therefore think, on the undisputed facts, the decree must be affirmed.

But again (assuming that the notice was insufficient and assuming that there was a right of forfeiture, whether by the bank as holder of the legal title or by the defendants as beneficiaries), we think the forfeiture was waived because these payments of rent were accepted with knowledge that the assignment had been made to the corporation.

The report of the master and the decree find that the bank had knowledge at the time it accepted the first payment of the rent, and, for reasons heretofore expressed, we think the evidence justified that or even a stronger finding.

The report of the master further finds that "on or before March 24, 1921, Parker H. Hoag had actual notice and knowledge * * * that title to the leasehold estate had been transferred to Traders Safety Building Corporation by Teich and Roessler." The specific manner in which this knowledge was ob-

tained is set forth, and we think there is abundant evidence upon which to base this finding. The evidence shows that on March 24, 1921, Hoag and Ullmann received a letter which stated:

*"The Traders Safety Building Corporation, the new owners of the Traders Building, 305-315 South LaSalle Street,* wishes to be advised in writing how you want insurance policies made payable in case of fire. Under the ground lease with the Shirk estate, insurance policies to the amount of $50,000 are required. Your early attention to this matter will be very much appreciated."

March 30, 1921, Hoag and Ullmann received a letter from E. A. Teich & Company with reference to this insurance, in which they say:

"We have not as yet received any answer from you in regard to dividing up the $50,000 building insurance for the building located at 305-315 South LaSalle Street, *owned by the Traders Safety Building Corporation."*

On September 27 thereafter Hoag and Ullmann wrote E. A. Teich, asking him to take up the question of this insurance at his earliest convenience, and to this letter Mr. Teich replied, under date of September 12, 1921, stating that the insurance policies had been sent to the various insurance companies to have a new clause inserted and had just been returned but were not made out in the way he wished, and promising as soon as the policies should be again delivered to take the matter up.

On November 12, E. A. Teich & Company wrote Hoag and Ullmann, stating:

"We herewith enclose statement of all building insurance carried by the Traders Safety Building Corporation on the building above mentioned. What plans have you made regarding placing all the insurance policies in the hands of the insurance trustee?"

Inclosed was a detailed statement of the number and amount of the policies, etc., on "Traders Safety Build-

ing Corporation—Insurance Building, 305-315 South LaSalle Street.''

The evidence further indicates that Mr. Hoag had a number of conferences with reference to this insurance with Ernst A. Teich; that for something like six months or a year, Mr. Hoag had more or less to do with this insurance matter and had personal charge of it; that Hoag had a talk with Mr. Gardner, the treasurer of the Chicago Title and Trust Company, about this insurance in March or April, 1921, at which time he told Gardner that ''the last assignment was to Traders Building Company,'' and that there was a mortgage back and that the holder of the mortgage must be protected.

As a matter of fact, Mr. Hoag prepared the loss clause for these policies.

It also appears from the evidence that the light, heat and power were furnished to both buildings by the Webster Light & Power Company, which went into the hands of a receiver; that the receiver called a meeting of the consumers to discuss the question of rates at his office; and that this meeting was held March 14, 1921. Mr. Hoag attended that meeting at the request of Mr. Taylor, who was the manager of the Imperial Building; that at that time there was a roll call to find out who were present and what buildings and interests were represented; that Mr. Hoag stated he represented the First Trust and Savings Bank as executor of the Shirk estate; and that Mr. Davis, who was present, stated that he represented the Traders Safety Building Corporation. An agreement was drawn up showing the rates to be paid by the parties, including the Traders Safety Building Corporation. This agreement was on or about March 15, 1921, signed by the bank as executor of the estate of E. W. Shirk and by the Traders Safety Building Corporation. Mr. Boisot, who executed the agreement for the bank, as Mr. Hoag himself says, signed this agreement on his, Hoag's advice.

A subsequent meeting was held at the receiver's office on April 15, 1921, at which time Mr. Hoag attended and stated he represented the beneficiaries of the Elbert W. Shirk estate. Another agreement was drawn up by the parties which the Traders Safety Building Corporation refused to sign. Mr. Hoag approved this contract and Mr. Taylor signed it, apparently upon Mr. Hoag's advice.

The attorneys for the Webster Light & Power Company on April 18, 1921, wrote Mr. Hoag and Mr. Davis, who represented the Traders Safety Building Corporation, identical letters, inclosing a tentative draft of an agreement relating to the furnishing of steam and electric service. This agreement purported to be made by parties amongst whom was named Traders Safety Building Corporation as party thereto.

While there is other evidence to the same effect, we think the recitation as above made is sufficient to sustain the finding of the master, to the effect that Parker H. Hoag had actual knowledge that the assignment had been made in fact to the corporation and not to Mr. Kardos.

Whether this knowledge of Mr. Hoag could be imputed as a matter of law to his principals is another controlling question. The master and the decree find that it is so imputed and that, imputing such knowledge to his principals, the receipt of the rent on June 1, September 1 and December 1 amounted to a recognition of the Traders Safety Building Corporation as the lawful assignee and tenant of the leasehold estate. If this finding of law is correct, then, irrespective of other questions, the decree must be affirmed.

There is much discussion in the briefs as to the scope of Mr. Hoag's employment. Mr. Hoag was all this time a practicing attorney and a member of the firm of Hoag and Ullmann. These were attorneys for Elbert W. Shirk in his lifetime. They drew his

will. They were employed as attorneys by the First Trust and Savings Bank as executor under the last will and testament of Elbert W. Shirk, and for the same bank as administrator of the estate of Elbert Walker Shirk. They represented all the Shirk heirs and devisees in a suit brought by the widow of Elbert W. Shirk to set aside a postnuptial agreement. The suit was settled. They were consulted on legal matters by the bank during all the time the matters here in controversy occurred and prior thereto and thereafter. They were also attorneys during the year 1921, prior thereto, and thereafter, for the beneficiaries under the will of Elbert W. Shirk and for Joseph H. Shirk and Richard E. Edwards, both of whom represented other members of their respective families in these matters. All the beneficiaries approved of the appointment of Hoag and Ullmann as attorneys for the bank as executor. Joseph H. Shirk and Richard E. Edwards also consulted orally from time to time with this firm, wrote to and received letters from the firm about legal matters pertaining to these and other interests. These attorneys did not receive a salary or retainer, but they acted whenever any legal services were required by these clients in Chicago. For services to the bank as executor they were paid by fees allowed by the probate court. Mr. Hoag acted in matters of insurance connected with the property here in question, and in regard to the electric service, as we have before said. They rendered a bill for these services, which was paid.

In view of these uncontradicted facts, we do not deem it necessary to discuss at length the nature of Mr. Hoag's employment by these defendants or to consider whether he was simply a special or general attorney or agent.

When the contract out of which this controversy grew was first negotiated, the information as to who the equitable owners were was obtained from him.

His employment to represent the defendants in connection with the subject matter of this litigation seems to have been continuous.

The defendants argue that his knowledge cannot be imputed to them as his principals because the extent of his agency was not such as to give him power to dispose of their property; that his authority did not extend to the *jus disponendi* of the property itself. Therefore, they say, notice to him was wholly immaterial. This is not the law, however, as was pointed out by Judge Baker in *Ledgerwood v. Bushnell*, 128 Ill. App. 555. The true test is, was the information obtained in the course of transaction of the business of the agency. If so, it is notice to the principal which he apparently will not be heard to deny.

As Chief Justice Caton said in *Williams v. Tatnall*, 29 Ill. 564 (where the inquiry was whether one party is chargeable with notice of a mortgage, and it was conceded there was no personal knowledge): "The law is not disputed that notice to an agent or an attorney when received in the course of the business of the agency, or under such circumstances as induce the satisfactory belief that it was received while transacting such business, is as effectual as notice to the principal personally."

Such is held to be the law under two distinct theories, the one that of the unity of the attorney and client, the other that it will be presumed conclusively the knowledge of the attorney was communicated to the client. The test is not whether the scope of the agent's or attorney's employment is such that he would have the power to sell or dispose of the property to which it relates. On the first theory, that would be wholly immaterial; and on the second theory, can any one doubt, in view of the uncontradicted evidence as to the scope of Mr. Hoag's employment, that it was his duty to communicate to his client's knowledge, which came to him in the course of his employment,

that the leasehold had in fact been assigned to a corporation and not to an individual?

The defendants cite *Saffron Walden Second Benefit Bldg. Society v. Rayner,* 14 Ch. Div. 406, to the point that they are not bound by notice to Mr. Hoag. In that case, the mortgagee of a reversionary interest in a testator's estate gave notice of his incumbrance to a firm of solicitors who were acting for the trustees and executors in a chancery suit, to which the testator had been a party. The solicitors had been employed by the trustees in all matters connected with the estate in which professional assistance was required. These solicitors accepted service, but the evidence, in the opinion of the court, was insufficient to show the notice was ever in fact communicated to the trustees. This notice was held insufficient to charge the trustees, James, L. J., saying:

"I am prepared therefore to say that, before a notice of this kind of a charge upon the property can be of the slightest validity, it must be given, if given to a solicitor, to a solicitor who is actually either expressly or impliedly authorized as agent to receive such notices, and I am of the opinion that, in this case, the solicitors were not so authorized."

And Bramwell, L. J., in a concurring opinion, put the decision upon the ground that there was no duty on the part of the solicitors to communicate the notice to the trustees. It does not clearly appear from the opinions as to what was the scope of the employment of these solicitors. As we have already said, we think, on the facts which appear in this case, there was a duty on the part of Mr. Hoag to communicate his knowledge to his principals. It certainly does not appear that the scope of his duties was the same as that of an English solicitor.

*Matthews v. Smallwood,* [1910] 1 Ch. Div. 777, is another case upon which defendant relies. The point in that case was whether one Willmot, agent of the landlord, Smallwood, had notice of a subdemise by

way of mortgage on account of which an alleged forfeiture arose. The court held that Willmot was agent only for a particular purpose, in which the subdemise was not involved, and that he did not in fact have notice, and that, if he had had it, his agency was not such that ''he was in any way bound to communicate to Mr. Smallwood.'' This decision is not inconsistent with the views herein expressed.

It would extend this opinion unduly to discuss the cases cited and relied on. Most of these, as well as many others, will be found collected in a note to *Hess v. Conway,* 4 A. L. R. 1580. The law applicable is clearly set forth in 2 Corpus Juris, p. 859 and 6 Corpus Juris, p. 639, and almost innumerable cases are there cited.

We have no doubt that the actual knowledge of Mr. Hoag must in law be imputed to his clients, and that the decree must therefore be affirmed.

We have thus far assumed that the notice served was in fact insufficient and that the leasehold estate might therefore have been forfeited. The complainants contend otherwise, and we are not at all sure that a court of equity would, under the circumstances, permit a forfeiture. The lease does not contain, strictly speaking, a covenant against assignment, and, in so far as the particular person to whom an assignment might be made, there is absolutely no restriction. The Traders Safety and Building Corporation was not in existence at the time the contract to assign was made, and when it came into existence it was in substance another name for Kardos himself, since he held all the stock with the exception of three shares. There is nothing in the record to indicate that there was any attempt to deceive. The purpose of requiring the notice, it is apparent, was solely in order that the lessors might have the option to purchase at the price at which it was proposed to sell. The notice served accomplished this purpose, and the defendants who

testified frankly said, in substance, that they did not take over the lease because they did not think, under all the circumstances, it would be to their interest for them to do so. A court of equity looks to the substance and disregards mere formalities. We doubt very much whether it can be held that the defect in the notice made possible the forfeiture of this valuable leasehold. This, however, is a question which we need not decide.

Whether we regard the bank or the defendants as the party to whom the right of forfeiture might accrue, that right has been waived by reason of the facts hereinbefore set forth.

The decree of the circuit court is affirmed.

*Affirmed.*

MCSURELY, P. J., and JOHNSTON, J., concur.